AMERICAN ELECTRIC POWER
SERVICE CORPORATION,
Defendant-Appellant,

v.

C. O. BESHEAR, Plaintiff-Appellee.

No. 75–1574.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 14, 1975.

Decided Jan. 20, 1976.

Martin Roach, Roach, Cox & Brown, Louisville, Ky., Robert W. Brigham, Cincinnati, Ohio, William E. Olson, New York City, for defendant-appellant.

Victor W. Ewen, Ewen, MacKenzie & Peden, William A. MacKenzie, Louisville, Ky., for plaintiff-appellee.

Before PECK, Circuit Judge, MARKEY, Chief Judge, United States Court of Customs and Patent Appeals,* and ENGEL, Circuit Judge.

MARKEY, Chief Judge, United States Court of Customs and Patent Appeals:

This is an appeal from the judgment of the United States District Court for the Western District of Kentucky ordering and adjudging that plaintiff Beshear recover $4,766,203.00, with interest at the rate of 6 per cent per annum from June 29, 1973 until paid. We affirm.

### Facts

Beshear, a former landman ** for Peabody Coal Company, and his partner John Vogler, acquired options for coal on approximately 14,275 acres in Southern Indiana. By design, the options were obtained on acres arranged in a checkerboard pattern. Because the optioned acres were primarily in Posey County, with a few in adjoining Gibson and Vanderburgh Counties, the area of interest herein is called the "Posey Field."

Defendant-Appellant, American Electric Power Service Corporation, (AEP) had plans to construct an electric power plant near Henderson, Kentucky, directly across the Ohio River from the Posey

---

* Sitting by designation.

** Landmen, acting as agents for a prospective purchaser, cover their assigned territory by calling at the homes of land owners and negotiating the purchase of land or mineral interests.

Field. Operation of the plant would entail the need for an assured supply of coal.

In the spring of 1969, Beshear, without Vogler's knowledge, approached AEP and offered to sell the options. Subsequent meetings produced a general agreement that AEP would purchase the options and retain Beshear to acquire additional options. In October of 1969, without disclosing the AEP deal, Beshear offered to buy Vogler out.

AEP and Beshear, after exchanging several drafts, finally executed an agreement on January 3, 1970 (agreement), the pertinent portions of which read:

\* \* \* \* \* \*

5. Upon the assignment of your options under items 2 and 3 above, AEP will promptly begin an exploratory program to determine the tons of coal in said reserves, the coal quality and the expected cost of producing the coal. If such program proves that the coal in this area is minable and it also proves possible to consolidate all or substantial part or parts of the aforesaid acreage and any additional areas which might be acquired into minable tract or tracts, then AEP will either exercise or advise you of its intention to exercise the options for such acreage assigned to it by you in items 2 and 3 above.

If such program proves the coal is not minable, or it becomes impossible to consolidate the coal into minable tracts, AEP will not exercise the options assigned to it by you. AEP will re-assign to you said options, if you so desire, provided you will reimburse AEP for any amounts expended by AEP in connection with this coal reserve. For the purposes of this agreement, the options shall be deemed to have been exercised by AEP if they were not re-assigned to you or offered for reassignment to you within three years from the date when you assign the options to AEP as provided in items 2 and 3 above. Upon such offer by AEP to re-assign said options to

you, you shall have a six-month period in which to accept such offer.

6. At any time within five years after AEP has exercised its options as provided in item 5 above, you may, at your election from time to time, request AEP to pay you, an advance royalty for such coal covered by all or any number of such options which you have acquired and assigned to AEP (excluding the 7,500 acres mentioned above in item 2), at a rate of $0.015 per ton, using a reasonable recoverable factor (which is expected to be 3,750 tons per seam per acre) to arrive at the total amount due. Upon such payment by AEP, you shall have no further claims with respect to such coal.

\* \* \* \* \* \*

8. Once we have progressed beyond item 1 above, you shall continue to acquire options on additional areas acceptable to AEP in Posey and Vanderburgh Counties, Indiana. AEP will pay the cost of obtaining such additional options and shall in addition reimburse you as provided in item 6 or 7 above, as the case may be. In the event AEP independently acquires coal without your help within the limits of the coal field, then the reserves in such areas shall be included under items 6 and 7 above for the payment of royalties to you.

\* \* \* \* \* \*

On April 18, 1970, test drillings having proved satisfactory, Beshear assigned to AEP the original options on 14,275 acres. In return, AEP reimbursed Beshear for the cost of buying out Vogler and paid Beshear his first annual advance royalty payment of $25,000. AEP also "reimbursed" Beshear an additional $29,438 as Beshear's cost of acquiring the original options, although in fact Vogler had paid $27,000 of that cost.

Beshear commenced obtaining additional options for AEP, receiving his expenses and a per diem from AEP. About three months thereafter, without telling Beshear, AEP also hired one Tay-

lor to buy coal options in the Posey Field. Beshear quickly learned of this and complained that a "competitor" (Taylor) was offering $100/acre whereas he, Beshear, was permitted to offer only $50/acre. AEP then authorized Beshear to offer $100/acre. By August of 1970, AEP had admitted hiring Taylor and had split the field between him and Beshear. In the spring of 1971, AEP notified Beshear that, effective June 30, 1971, he should cease obtaining options for AEP. As of June 30, 1971, Beshear had optioned an approximate total of 38,000 acres (including the original 14,275) and Taylor 20,000 acres. Subsequent to June 30, 1971, Taylor acquired options on another 25,000 acres. Thus AEP acquired options on a total of approximately 83,000 acres.

During late 1972, AEP drilled 75 core samples and, after evaluating the tests, elected to keep the coal rather than cancel under the provisions of paragraph 5 of the agreement.

On April 21, 1973 and June 28, 1973, Beshear elected the provisions of paragraph 6 of the agreement. He requested $.015 per ton on the recoverable coal in seams 5 and 6 in a specified acreage which he computed to be 64,723 acres, but which was stipulated at trial to be 56,280 acres. On September 28, 1973 Beshear filed a complaint in the U. S. District Court for the Western District of Kentucky at Louisville.

During the discovery period, AEP supplied Beshear with a report by its chief geologist, covering the 131,000 acre Posey Field area, giving the average thickness of coal in Seam No. 5 as 51.75 inches and that in Seam No. 6 as 51.1 inches, and finding Seam No. 6 minable in ⅔'s of the area. The amount recoverable was set at 50% in both seams. It was later stipulated that Seam No. 5 is present in 95% of the acreage.

At trial, AEP's chief geologist testified that a subsequent study on a 60,000 acre area, which included most of the stipulated 56,280 acres, found that the thickness of coal in Seam No. 5 was 50.9 inches and in Seam No. 6 was 50.5 inches

and reported Seam No. 6 minable on 52% of the area. The amount recoverable was reported as 46% in Seam No. 5 and 43.5% in Seam No. 6. Coal of this type normally runs 150 tons per acre inch.

The only matter submitted to the jury was the amount that Beshear should recover. The jury was instructed to arrive, after weighing the evidence on each issue of fact, at a verdict for Beshear in an amount between $5,269,231 if they found all variables (coal thickness and minability) in Beshear's favor and $4,115,941 if they found all the variables in AEP's favor. The jury returned a verdict in the amount of $4,766,203, after crediting AEP with $100,000 in advance royalties it had paid to Beshear, $27,000 of the amount AEP had reimbursed Beshear, and certain per diem expenses paid Beshear above his actual out of pocket cost. The court granted Beshear's motion to add interest from June 29, 1973, the day after Beshear had requested payment of royalties.

## Issues

The issues, as presented to us by appellant, are: (1) whether Beshear is precluded from recovering because he was not a licensed real estate broker; (2) whether fraud in the inducement should have been submitted to the jury; (3) whether an alleged ambiguity of paragraph 8 should have been submitted to the jury; (4) whether Beshear should have been denied recovery on acreage acquired by AEP after June 30, 1971; (5) whether Beshear's proof was insufficient to create a jury issue as to the persistency, availability and average thickness of the coal seams; (6) whether the court erred in allowing the jury to consider mutually exclusive evidence in arriving at a verdict; and (7) whether it was an abuse of discretion to award prejudgment interest.

## OPINION

(1) Beshear was NOT Acting in a Brokerage Capacity.

█ Because we view the agreement as one for the sale of an interest in land, the fact that Beshear was not a licensed real estate broker is immaterial. That AEP knew or should have known of Beshear's non-licensed status is equally immaterial. Nor was the agreement one for employment, entitling Beshear only to commissions earned through his personal efforts.

At the heart of the controversy lies paragraph 8 of the agreement, which essentially provides—(1) that Beshear shall continue obtaining options at AEP's cost and (2) that royalties to be paid are to be based on the total acreage (with certain specified exclusions) acquired by AEP in the coal field.

The plain language of paragraph 8 establishes that the agreement was a sales contract. Beshear agreed to convey title to his original options, and AEP, in turn, agreed to pay an amount based on one of the alternate scales set forth in paragraph 6 or 7, as applied to the acreage denoted in paragraph 8. We note that Beshear's original options did not, themselves, represent a single minable tract but a checkerboard pattern of options, which would effectively inhibit others from acquiring a minable tract in the Posey Field. In other words, the original options represented a means of control over the Posey Field which could, when filled in and consolidated with additional options, create a large minable tract and insure AEP of the desired availability of coal. That was what AEP was seeking and, in the end, obtained. How large or how valuable that tract might be depended on many factors and could not have been accurately predicted in January of 1970. Royalties based on the value of the minable coal made finally available to AEP, as a result of the agreement, appears to have been an equitable and reasonable method of determining the value of the property transferred to AEP by Beshear. It was a method agreed upon by experienced men of business, bargaining at arm's length.

█ Beshear's obtaining of additional options, whether or not interpretable as the action of a broker, was not a condition precedent to the payment of royalties under the agreement. Paragraph 8 expressly provides that Beshear is to collect royalties on the entire coal acreage acquired by AEP, whether or not he personally obtained options on any additional acres.

Paragraph 5 provides that AEP may cancel the agreement if (1) the field proved unminable or (2) AEP were unable to consolidate its options into an area large enough to mine. There is no provision in the agreement which would entitle AEP to cancel or change its obligations to Beshear under paragraphs 6–8 upon failure of Beshear to obtain additional options for consolidation. We find no contractual correlation whatever between any activity of Beshear which might be viewed as that of a real estate broker and AEP's royalty obligation under the agreement.

Beshear was not to receive commissions. He was, however, not without motivation to continue helping AEP to acquire options. He received advances on expenses and a per diem allowance. His continued effort in the consolidation process helped to insure against cancellation under paragraph 5 of the agreement.

█ The agreement is for the sale of real estate interests of which Beshear was at least co-owner. Property owners may sell their own property without participation of real estate brokers. Ind. Stat.Ann. § 25–34–1–22. Beshear's sale of property, consisting of certain options to mine coal, whether owned or co-owned by Beshear, was not in violation of the Indiana Real Estate Brokerage Law, Ind.Stat.Ann. § 25–34–1–1 through § 25–34–1–25, or of public policy. That Beshear was not a licensed real estate broker cannot, therefore, preclude his recovery under the agreement.

(2) Fraud in the Inducement.

AEP charges that Beshear's allowing AEP to believe that he had paid $29,438 in out of pocket expenses in acquiring the original coal options constitutes

fraud in the inducement. In *Auto Owners (Mutual) Insurance Co. v. Stanley*, 262 F.Supp. 1, 4 (N.D.Ind.1967) the elements of fraud were succinctly listed:

> But fraud to be cognizable in the law must consist of a number of essential elements: (1) representations of material facts; (2) reliance thereon; (3) falsity of the representations; (4) knowledge of the falsity; (5) deception of the defrauded party; (6) injury. *Automobile Underwriters, Inc. v. Smith*, 131 Ind.App. 454, 166 N.E.2d 341 (1960).

We note the fatal absence from the evidence in this case of the first two and the last of the foregoing essential elements, *i. e.*, materiality, reliance, and injury.

■ From the testimony, it is clear AEP was interested in acquiring a supply of coal, the key to which was the mineral rights which Beshear controlled or owned. It was material that the original options had been paid for. The source of the money for the payment was immaterial. As the testimony of Mr. Martinka, an Assistant Vice President of AEP, makes clear, the agreement would not have been rejected or terminated if AEP had known that Vogler had supplied most of the funds. The representation was thus neither made by Beshear nor received by AEP as an inducement to AEP's entry into the agreement. There was no evidence that AEP relied on or was injured by any reliance on any representation regarding the source of the funds involved. There was, therefore, no basis for submission of the inducement issue to the jury.

### (3) Ambiguity in Paragraph 8.

AEP asserts that paragraph 8 is indefinite regarding the acreage to be included in the royalty calculation. From that assertion AEP argues that paragraph 8 may be interpreted as excluding the land acquired independently of Beshear's help. That interpretation, however, flies directly in the face of the plain language of paragraph 8, which reads in part:

> In the event AEP independently acquires coal without your help within the limits of the coal field, then the reserves in such areas shall be included under items 6 and 7 above for the payment of royalties to you.

■ As a matter of law, we find nothing in paragraph 8, or anywhere in the agreement, which would render the foregoing provision ambiguous or which would conflict with its interpretation as mandating that Beshear be paid a royalty on the total acreage acquired by AEP within the period specified in paragraph 6. Submission of the ambiguity question to the jury would not, therefore, have been proper.

### (4) Recovery on Options Acquired After June 30, 1971.

■ The termination of Beshear's services, as of June 30, 1971, has no effect on his right to recovery under the agreement. As pointed out above, the agreement is for the sale of a real property interest. It is not a personal service contract. The agreement calls for the conveyance of an apparently controlling interest in a coal field, at a price to be determined by the value of the coal ultimately made available. The agreement specifically provides, in paragraph 8, for payment to Beshear of royalties on coal options obtained without his help. That Beshear continued to aid in consolidating the initial control area into a minable tract bore no contractual relation to the basis on which royalties were to be measured. AEP, by terminating Beshear's optioning activities, could not thereby limit its obligations under paragraphs 6–8 of the agreement. We find no error in the interpretation of the plain language of the agreement as requiring recovery on options acquired after June 30, 1971.

### (5) Sufficiency of Beshear's Proofs.

■ The amount of recovery turned on the determination of the amount of recoverable coal in the 56,280 acres in

controversy. There was testimony regarding the amount of coal in a 60,000 acre area at the heart of the optioned region. There was documentary evidence of the persistency and thickness of coal seams in the 131,000 acre regional study. That there was no direct evidence on the exact area in question cannot be viewed as precluding submission of the fundamental fact issue to the jury. It being the jury's function to resolve disputed questions of fact it may do so by extrapolation from overlapping or conflicting factual data to find the amount of recoverable coal in the exact acreage in question. The documentary exhibits and oral testimony which comprised Beshear's proofs, being probative of the facts in dispute, were sufficient to create a jury issue regarding the persistency, availability and average thickness of the coal seams.

(6) Mutually Exclusive Evidence.

■ Appellant, by its argument on this issue, appears to recast the role of the jury, from its established role as the finder of fact to that of deciding which party's overall version of the facts is more credible. Here, for example, the thickness of Seam No. 5 was an issue of fact; the thickness of Seam No. 6 was another issue of fact. No precise relationship between the thickness of one seam and that of the other, and no relationship between the thickness of a coal seam and the per cent of coal recoverable, is established by the evidence. The jury must weigh the evidence on each issue of fact and find accordingly. Where, as here, the facts are independent of each other, they need not all be found according to the proofs of one party. We find no error in allowing the jury to reach its verdict upon its determination of the facts from the evidence presented to it.

(7) Prejudgment Interest.

■ AEP had sole possession of all of the information necessary to determine the amount of remuneration due under the agreement. Beshear could not,

therefore, have known how much money to request at the time of demanding payment. He did, however, follow the language of the agreement in electing to request payment under the provisions of paragraph 6. AEP knew of its obligations under the agreement, of the coal optioned, of its 1971 termination of Beshear's optioning activities, and of Beshear's April 27, 1973 and June 28, 1973 requests for payment under paragraph 6 of the agreement. We find no abuse of the trial court's discretion in its award of interest beginning with the day after the June 28, 1973, demand for payment.

Accordingly, the judgment of the district court is, in all respects, *affirmed.*

Affirmed.