Connie S. WEDEL, as personal representative of the Estate of Charles O. Beshear, Deceased, Appellant–Plaintiff,

v.

AMERICAN ELECTRIC POWER SERVICE CORPORATION and Ohio Valley Coal Company, Inc., Appellee–Defendants.

No. 87A04–9602–CV–53.

Court of Appeals of Indiana.

June 12, 1997.

Rehearing Denied Sept. 5, 1997.

1124

Thomas H. Morsch, Timothy E. Kapshandy, Steven J. Ellison, Theodore T. Chung, Sidley & Austin, David P. List, Chicago, for appellant.

G. Daniel Kelley, Jr., Edward P. Steegmann, Ice Miller Donadio & Ryan, Indianapolis, for appellees.

## OPINION

CHEZEM, Judge.

*Case Summary* [1]

Plaintiff–Appellant, Connie S. Wedel ("Beshear"),[2] appeals the trial court's order granting partial summary judgment in favor of Defendant–Appellee, American Electric Power Service Corporation ("AEP"). Judgment was entered "Re: Perpetuities Issues" with the express determination that there is not just reason for delay pursuant to Trial Rule 56(C). We affirm in part and reverse in part.

*Issue*

Beshear raises several issues in this appeal: 1) whether the failure to plead an affirmative defense is a waiver of the issue in a subsequent suit between the parties; 2) whether the rule against perpetuities applies to an overriding royalty interest in coal; and 3) whether an agreement in violation of the rule against perpetuities can be reformed to preserve the agreement. We restate the issue on appeal as:

> Whether the specific findings of fact and conclusions of law entered by the trial court support the finding that the overriding royalty agreement between the parties for the sale of coal deed options violates the rule against perpetuities.

---

1. Oral argument was held in Indianapolis on November 6, 1996.

2. Charles O. Beshear originally brought this action, but died during its pendency. His daughter, Connie S. Wedel, substituted as his personal representative. For purposes of clarity, petitioner is referred to as "Beshear" in this opinion.

*Facts and Procedural History*

The facts most favorable to the judgment, as set forth herein, are largely taken from an earlier action between these parties. *See American Elec. Power Serv. Corp. v. Beshear*, 529 F.2d 1113 (6th Cir.1976).

Beshear and his partner acquired options for coal on approximately 14,275 acres in Southern Indiana. By design, the options were obtained on acres arranged in a checkerboard pattern in Posey, Gibson, and Vanderburgh Counties. AEP had plans to construct an electric power plant in Kentucky, directly across the Ohio River, which would entail the need for an assured supply of coal. In the spring of 1969, Beshear approached AEP and offered to sell the options. Subsequent meetings produced a general agreement that AEP would purchase the options and retain Beshear to acquire additional options on behalf of AEP. AEP and Beshear executed an agreement on January 3, 1970, the pertinent portions of which read:

5. Upon the assignment of your options under items 2 and 3 above, AEP will promptly begin an exploratory program to determine the tons of coal in said reserves, the coal quality and the expected cost of producing the coal. If such program proves that the coal in this area is minable and it also proves possible to consolidate all or substantial part or parts of the aforesaid acreage and any additional areas which might be acquired into minable tract or tracts, then AEP will either exercise or advise you of its intention to exercise the options for such acreage assigned to it by you in items 2 and 3 above.

If such program proves the coal is not minable, or it becomes impossible to consolidate the coal into minable tracts, AEP will not exercise the options assigned to it by you. AEP will re-assign to you said options, if you so desire, provided you will reimburse AEP for any amounts expended by AEP in connection with this coal reserve. For the purposes of this agreement, the options shall be deemed to have been exercised by AEP if they were not re-assigned to you or offered for reassignment to you within three years from the date when you assign the options to AEP as provided in items 2 and 3 above. Upon such offer by AEP to re-assign said options to you, you shall have a six-month period in which to accept such offer.

6. At any time within five years after AEP has exercised its options as provided in item 5 above, you may, at your election from time to time, request AEP to pay you, an advance royalty for such coal covered by all or any number of such options which you have acquired and assigned to AEP (excluding the 7,500 acres mentioned above in item 2), at a rate of $0.015 per ton, using a reasonable recoverable factor (which is expected to be 3,750 tons per seam per acre) to arrive at the total amount due. Upon such payment by AEP, you shall have no further claims with respect to such coal.

. . . .

8. Once we have progressed beyond item 1 above, you shall continue to acquire options on additional areas acceptable to AEP in Posey and Vanderburgh Counties, Indiana. AEP will pay the cost of obtaining such additional options and shall in addition reimburse you as provided in item 6 or 7 above, as the case may be. In the event AEP independently acquires coal without your help within the limits of the coal field, then the reserves in such areas shall be included under items 6 and 7 above for the payment of royalties to you.

*Id.* at 1115.

On April 18, 1970, Beshear assigned to AEP the original options on 14,275 acres. In return, AEP reimbursed Beshear for the cost of acquiring the original options, and paid Beshear his first annual advance royalty payment. Beshear commenced obtaining additional options for AEP until he was notified by AEP that effective June 30, 1971, he should cease obtaining options for AEP. As of that date, Beshear had optioned an approximate total of 38,000 acres (including the original 14,275) while AEP had acquired options on another 20,000 acres through another agent. Subsequent to June 30, 1971, AEP independently acquired options on an additional 25,000 acres. Thus AEP acquired options on a total of approximately 83,000

acres. During late 1972, AEP elected to keep the coal rather than cancel under the provisions of paragraph 5 of the agreement. *Id.* at 1115–16.

On April 21, 1973 and June 28, 1973, Beshear elected the advance royalty provisions of paragraph 6 of the agreement. He requested $0.015 per ton on the recoverable coal in seams 5 and 6 in a specified acreage, later stipulated by the parties to be 56,280 acres. When AEP refused to pay, Beshear filed a complaint in the U.S. District Court for the Western District of Kentucky. The only matter submitted to the jury was the amount that Beshear should recover under the 1973 elections. The jury returned a verdict in the amount of $4,766,203.00 plus interest and judgment was entered for Beshear. *Id.* at 1116.

■ AEP appealed the judgment on numerous grounds, three of which are relevant here:

(1) whether Beshear is precluded from recovering because he was not a licensed real estate broker; ... (3) whether an alleged ambiguity of paragraph 8 should have been submitted to the jury; [and] (4) whether Beshear should have been denied recovery on acreage acquired by AEP after June 30, 1971.

*Id.* at 1116. The rule against perpetuities was not raised by AEP as a defense in that action. As to the first issue, the Sixth Circuit panel held that

[t]he agreement is for the sale of real estate interests of which Beshear was at least co-owner. Property owners may sell their own property without participation of real estate brokers.... That Beshear was not a licensed real estate broker cannot, therefore, preclude his recovery under the agreement.

*Id.* at 1117. Regarding an alleged ambiguity in paragraph 8 of the agreement, which ambiguity apparently related to the acreage to

be included in the royalty calculation, the court stated,

[a]s a matter of law, we find nothing in paragraph 8, or anywhere in the agreement, which would render the foregoing provision ambiguous or which would conflict with its interpretation as mandating that Beshear be paid a royalty on the total acreage acquired by AEP *within the period specified in paragraph 6.*[3]

*Id.* at 1118 (emphasis added).[4] It was, therefore, proper that this issue was not submitted to the jury. The court also explicitly held that "[t]he agreement specifically provides, in paragraph 8, for payment to Beshear of royalties on coal options obtained without his help.... We find no error in the interpretation of the plain language of the agreement as requiring recovery on options acquired after June 30, 1971." *Id.* at 1118. The judgment was affirmed in all respects.

Thereafter, on August 15, 1977, and again on February 13, 1978, Beshear made further elections to receive advance royalties on coal deed options obtained independently by AEP. After negotiation, two agreements, dated January 19, 1978 and April 18, 1978, were executed. These agreements amended the original agreement between the parties and simplified the royalty calculations, resulting in further payments to Beshear of $645,025.75 and $1,089,092.42. (R. 104–05, 119–21).

On June 22, 1978, Beshear made a general election to receive advance royalties, this time on all acreage not previously elected and specifically for all recoverable coal in seam 7. Again, on June 20, 1983, Beshear made an election regarding all seams of minable coal in acreage acquired by AEP to date. Finally, on September 14, 1983, Beshear made an election regarding acreage in two specific tracts, for coal in seams 5 and 6. AEP did not make payment on any of these three elections.

---

**3.** AEP apparently exercised its options in late 1972. *See American Elec. Power Serv. Corp.,* 529 F.2d at 1116. The period specified during which Beshear could elect advance royalties apparently expired sometime in late 1977.

**4.** We agree that these provisions are not ambiguous and therefore disagree with Beshear's contention that the agreement is capable of construction to avoid any violation of the rule against perpetuities.

Beshear filed this action on August 1, 1986 to recover royalties on coal options acquired by AEP subsequent to the 1978 amendments to the original agreement and for royalties on coal reserves in acreage *not* acquired by AEP.[5] (R. 14). On January 23, 1995, AEP filed its Motion for Partial Summary Judgment Re: Perpetuities Issues, which the trial court granted on July 5, 1995. Beshear appeals that decision.

### Discussion and Decision

■■■ Upon review of the grant or denial of a summary judgment motion, we apply the same legal standard as the trial court: summary judgment is appropriate only when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *North Snow Bay, Inc. v. Hamilton*, 657 N.E.2d 420, 422 (Ind.Ct.App.1995). On review, we may not search the entire record to support the judgment, but may only consider that evidence which had been specifically designated to the trial court. *Id.* The party appealing the trial court's grant or denial of summary judgment has the burden of persuading this court that the trial court's decision was erroneous. *Id.*

■■■ Beshear first contends that AEP improperly raised the rule against perpetuities as a defense in this action, the contention being loosely denominated as either waiver, equitable estoppel,[6] res judicata, or collateral estoppel, this defense not having been raised in the earlier federal court suit. AEP argues in turn that Beshear himself waived review of these issues by not arguing them before the trial court. In his trial court brief, however, Beshear does refer to "the policies underlying the related doctrines of collateral estoppel and res judicata" in regard to AEP's failure to raise the perpetuities defense in the earlier suit. (R. 145). Though this argument is not well developed by Beshear, AEP nonetheless prevailed at trial on the perpetuities issue, and had an adequate opportunity

to defend its position on the issues in its appellee's brief. Beshear also presented sufficient argument in his appellant's brief to satisfy Ind. Appellate Rule 8.3(A)(7) by incorporating the reasoning in his discussion of waiver into the argument on res judicata/collateral estoppel. In short, AEP has not been harmed by any shortcomings in Beshear's argument and the issues are therefore not waived.

### Waiver

■■■ Beshear cites a single case for the proposition that "the failure to plead an affirmative defense is a waiver of the defense in an *identical issue* in a subsequent suit." *General Teamsters v. Lawrence–Mercer County Builders Ass'n*, 88 F.R.D. 644 (W.D.Penn.1980) (emphasis added). Beshear submits that the validity of paragraph 8 of the 1970 agreement in the 1976 Sixth Circuit decision is an identical issue in the present action. That court found paragraph 8 unambiguous and provided that "Beshear be paid a royalty on the total acreage acquired by AEP." *American Elec. Power Serv. Corp.*, 529 F.2d at 1118. The issue before the Sixth Circuit panel was payment of advance royalties on acreage *acquired* by AEP. AEP acquired coal deed options through the efforts of both Beshear and another agent. In contrast, Beshear's present complaint seeks payment of royalties "for acreage that *would have been acquired*" by AEP. (R. 14.) (emphasis added). This was neither discussed nor decided in the earlier federal court action. In addition, Beshear's 1978 and 1983 advance royalty elections on further acreage and another coal seam were not before the court in 1976. These claims had not yet accrued.

■■■ Assuming that the rule against perpetuities constitutes an affirmative defense, AEP's failure to raise it previously does not act as a waiver of the defense as to acreage not acquired by AEP. Beshear, in his complaint, has raised much broader issues here:

---

**5.** The record does not indicate that Beshear ever made an election to receive advance royalties on coal reserves in acreage *not* acquired by AEP.

**6.** Beshear mentions equitable estoppel, but neither presents argument nor cites authority regarding this doctrine. This issue is waived pursuant to App.R. 8.3(A)(7) to the extent that it differs from res judicata and collateral estoppel.

whether he is entitled to royalties on elections made more than five years after AEP exercised its options in the coal assigned to it by Beshear, and whether he is entitled to royalties on all of the coal in the entire three-county coal field, whether or not AEP has acquired coal deed options on any particular acreage. Though Beshear argues this issue by analogy to Ind. Trial Rule 8(C), it is clear that waiver of an affirmative defense, when applied to a subsequent suit, is a question of res judicata. In light of our resolution of res judicata, *infra*, we need not further discuss the question of waiver or decide whether the rule against perpetuities constitutes an affirmative defense.

### Res Judicata/Collateral Estoppel

 The doctrine of *res judicata* consists of two concepts, claim preclusion and issue preclusion.[7] *Biggs v. Marsh*, 446 N.E.2d 977, 981 (Ind.Ct.App.1983). Claim preclusion applies where a final judgment on the merits has been rendered which acts as a complete bar to a subsequent action on the same claim between those parties and their privies. *Kieler v. C.A.T. by Trammel*, 616 N.E.2d 34, 36 (Ind.Ct.App.1993), *trans. denied*. When claim preclusion applies, all matters that were or might have been litigated are deemed conclusively decided by the judgment in the prior action. *Id.* The issue preclusion branch of res judicata is also referred to as collateral estoppel. *Progressive Casualty Ins. Co. v. Morris*, 603 N.E.2d 1380, 1382 (Ind.Ct.App.1992). Issue preclusion bars the subsequent relitigation of the same fact or issue where that fact or issue was necessarily adjudicated in a former suit and the same fact or issue is presented in a subsequent action. *Kieler*, 616 N.E.2d at 36; *Sullivan v. American Casualty Co. of Reading, Pa.*, 605 N.E.2d 134, 137 (Ind.1992). Where issue preclusion applies, the previous judgment is conclusive only regarding those issues actually litigated and determined therein.[8] *Kieler*, 616 N.E.2d at 36.

 Claim preclusion bars matters which *might have been* litigated in a prior action. Beshear concedes that claim preclusion is not applicable here, acknowledging that his claim is regarding royalties on elections made *after* the 1976 Sixth Circuit decision. A claim for payments accruing subsequent to a previous judgment is considered a different cause of action. *See Booher v. Richmond Square, Inc.*, 160 Ind.App. 44, 310 N.E.2d 89, 92 (1974). The present action being a different cause of action, the rule against perpetuities defense is not barred by claim preclusion. The defense then, must be barred, if at all, under the doctrine of issue preclusion. This requires that the rule against perpetuities defense was an issue *necessarily adjudicated* in a prior action.

 Beshear argues that the issue decided by the Sixth Circuit panel was the enforceability or validity of paragraph 8 of the

7. "The subject has often been confused by the loose use of descriptive terms." *Peterson v. Culver Educ. Found.*, 402 N.E.2d 448, 460 (Ind.Ct. App.1980). Older cases refer to claim preclusion as estoppel by judgment and to issue preclusion as estoppel by verdict or finding. *See id.* at 460–61; *In re A Search Warrant for the Comm'r of Labor*, 448 N.E.2d 1089, 1094 (Ind.Ct.App.1983).

8. At oral argument, this court requested the submission of supplemental authorities on the issue preclusive effect of an appellate decision on the underlying judgment or verdict. The cases cited by AEP indicate the general view is that if an appellate court affirms on one ground and disregards a second, there is no issue preclusion as to the unreviewed ground, the second ground no longer being conclusively established. *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 45 (2d Cir. 1986), *cert. denied; Martin v. Henley*, 452 F.2d 295, 300 (9th Cir.1971). All of AEP's supplemental authorities are cases in which the issue sought to be precluded was actually litigated in the trial court, as opposed to an issue or defense which was not even raised, but could have been raised. We agree with Beshear that these cases, while appropriately discussing issue preclusion, are distinguishable from the present case. In *American Elec. Power Serv. Corp.*, by contrast, the preclusive effect of the district court's judgment is not in question because the Sixth Circuit affirmed that judgment in all respects. It is the preclusive effect of only the appellate decision that is in question here.

AEP asks us to strike Beshear's response to its supplemental authorities and claims that Beshear has changed his theory on this issue by arguing claim preclusion in addition to issue preclusion. We decline to strike Beshear's response simply because the cases cited therein discuss res judicata in general and do not consistently distinguish between claim preclusion and issue preclusion.

1970 agreement. We agree, at least relative to the royalty elections Beshear had made as of that time. The Sixth Circuit found as a matter of law that paragraph 8 was not ambiguous in requiring royalty payments to Beshear on acreage acquired by AEP within the five-year period for election of advance royalties specified in paragraph 6 of the agreement. That court did not decide the issues of royalties on acreage *not* acquired by AEP or acreage for which Beshear did not make a timely election for advance royalties.

AEP argues that the issue decided in the prior federal court action was whether the 1970 agreement was an employment contract or an agreement for the sale of a real property interest. We agree with this also. Just as important as the question of which issues were before that court, however, is the question of which issues were not before it. We believe that the applicability of the rule against perpetuities to the 1970 agreement is an issue of law which was *not* before the federal court in 1976. Though Beshear argues that AEP could have raised the rule against perpetuities as a defense before the federal court, we find this argument untenable. From the record before us, it would be unreasonable to assume that AEP could have anticipated that Beshear would later claim advance royalties on acreage never acquired by AEP or that Beshear would seek to elect royalties beyond the five-year period. Because AEP did not have "a full and fair opportunity to litigate the issue," in the Sixth Circuit case, AEP is not barred from bringing the rule against perpetuities defense. *Sullivan,* 605 N.E.2d at 138.

### Rule Against Perpetuities

AEP claims that the 1970 agreement violates the rule against perpetuities. The rule against perpetuities is an ancient, but still vital, rule of property law intended to enhance marketability of property interests by limiting remoteness of vesting. *Brown v. American Fletcher Nat. Bank,* 519 N.E.2d 166 (Ind.Ct.App.1988), *trans. denied.* In 1991, Indiana enacted the Uniform Statutory Rule Against Perpetuities.[9] The applicability of the perpetuities statute is limited to "non-vested property interest[s] ... created on or after May 8, 1991." Ind.Code § 32–1–4.5–1. The instrument establishing the rights of the parties in this case was executed on January 3, 1970; therefore the new statute is not applicable here.

The common law rule as it existed at the time of the agreement read: "An interest in property shall not be valid unless it must vest, if at all, not later than twenty-one (21) years after a life in being at the creation of the interest." Ind.Code § 32–1–4–1 (repealed). In general, the word "vest" is used to mean either a vesting in possession or a vesting in interest. *Brown,* 519 N.E.2d at 168. Vesting in possession connotes an immediate, existing right of present enjoyment, while vesting in interest implies a presently fixed right to future enjoyment. *Id.* In the context of the rule against perpetuities, the majority interpretation is that for an interest to vest within the meaning of the rule, the interest must be vested in interest. *Id.* This is the interpretation that Indiana employs, and the fixed right to receive income sufficiently establishes that an interest is vested. *Id.*

We must first determine whether the 1970 royalty agreement created an interest in property subject to the rule against perpetuities, and if so, whether the interest was certain to vest within the required time period. Beshear contends that the 1970 agreement created no property interests, merely contractual rights.

The nature of the interests created by the parties was an issue necessarily decided by the previous federal court case and Beshear is now collaterally estopped from contending otherwise. The Sixth Circuit held, *inter alia,* that "the agreement [is] one for the sale of an interest in land.... Beshear agreed to convey *title* to his original options." *American Elec. Power Serv. Corp.,* 529 F.2d at 1117 (emphasis added). A discussion of the type of property interest created is necessary to determine if and when such interest vested for purposes of the rule against perpetuities. The general rule is, if a

9. Ind.Code § 32–1–4.5–1 to 32–1–4.5–6, as added by P.L. 149–1991, SEC. 4.

royalty interest is considered real property, its conveyance is considered to presently vest; but if considered personal property, vesting may not occur until the minerals are severed from the realty. *Denney v. Teel,* 688 P.2d 803, 809 n. 22 (Okla.1984).

> Some courts have held that the rule against perpetuities is not violated by a conveyance of a landowner's oil and gas royalty, since the grantee acquires a present, vested interest in land, while other courts have held that such conveyances, being transfers of personal property, may violate the rule against perpetuities.

Martin J. McMahon, Annotation, *Oil and Gas Royalty as Real or Personal Property,* 56 A.L.R.4th 539, 547 (1987).

In Indiana, mineral interests are considered real property and normally vest upon conveyance. Our supreme court has stated: "Interests or estates in oil, gas, coal and other minerals lying beneath the surface of the land are interests in real estate.... They are vested property interests separate and distinct from the surface ownership." *Short v. Texaco, Inc.,* 273 Ind. 518, 406 N.E.2d 625 (1980), *aff'd,* 454 U.S. 516, 102 S.Ct. 781, 70 L.Ed.2d 738 (1982). *See also* Ind.Code § 6–1.1–1–15.

The type of interest which Beshear reserved in assigning the coal options to AEP is known in Indiana as an "overriding royalty." An overriding royalty has been defined as

> a royalty interest in minerals located on property that the royalty holder (*i.e.,* grantee) does not actually own. An 'overriding royalty' is therefore distinguished from a conventional 'royalty' interest, which is retained by the owner of the fee, typically in a situation in which the mineral estate is leased to a lessee who plans to sever the minerals and pay the lessor compensation in the form of royalties.

*Commerce Bank of Kansas City v. Peabody Coal Co.,* 861 S.W.2d 569, 572 n. 4 (Mo.Ct. App.1993), *trans. denied. See also Halbert v. Hendrix,* 121 Ind.App. 43, 95 N.E.2d 221 (1950) (holding that, upon assignment of oil and gas lease, a reserved fractional interest in production created an overriding royalty in the nature of an incorporeal hereditament

which was subject to attachment as an interest in real estate).

Other authorities have used the term "perpetual nonparticipating royalty" to describe interests similar to those created by the 1970 agreement between Beshear and AEP:

> A "perpetual nonparticipating royalty interest" in oil and gas is a right to a percentage of oil or gas which may be produced out of given lands, unaccompanied by the power to lease or any substantial rights of ownership in the land apart from the royalty interest itself. Since the right to royalty is perpetual, and is separate from the power to lease, the right to the percentage of production frequently relates not only to whatever production may be realized under an existing lease, but also what may be realized under any future leases.

C. Marvel, Annotation, *Perpetual Nonparticipating Royalty Interest in Oil and Gas as Violating Rule Against Perpetuities,* 46 A.L.R.2d 1268 (1956). Indiana has not addressed the issue of whether an overriding or nonparticipating royalty interest is subject to the rule against perpetuities.

Beshear claims that AEP owes him advance royalties on various elections he made through 1983. These elections were made concerning coal in four types of acreage: 1) acreage obtained by Beshear prior to the 1970 agreement and originally assigned to AEP; 2) acreage obtained by Beshear on behalf of AEP through June 30, 1971; 3) acreage independently acquired by AEP both before and after June 30, 1971; and 4) acreage not acquired by AEP but "within the limits of the coal field." AEP has paid royalties on coal in the first two categories, and apparently on some coal in the third category. We examine each of these categories in turn to determine whether Beshear's royalty interest was vested or contingent.

Regarding the options originally assigned by Beshear to AEP, Beshear had two alternatives under the 1970 agreement: 1) elect advance royalties *within five years* after AEP exercised the options; or 2) wait to

receive royalties on coal actually mined.[10] Royalty on this acreage was vested in interest at the time of the agreement, but not vested in enjoyment until such time as Beshear should elect advance royalties or AEP should actually mine coal (or assemble a minable tract).

Under the rule against perpetuities, for an interest in property to be valid, it *must* vest not later than twenty-one years after a life in being. Any conceivable scenario in which the interest will not vest within the required period will void the interest entirely. "A limitation of an interest or estate in property which will not necessarily become vested within or at the end of the period prescribed by the rule against perpetuities is wholly void ab initio." I.L.E. Perpetuities § 3. Under the agreement, AEP need not have acquired any additional acreage at all after it exercised the original options assigned by Beshear. The fact that AEP actually acquired additional options, by itself, is irrelevant to the common law rule against perpetuities, which is concerned not with what does happen, but with what may (or may not) happen. This situation would be different under the current perpetuities statute, which allows us to wait-and-see if an interest "either vests or terminates within ninety (90) years." Ind.Code § 32–1–4.5–3. If subject to the current statute, Beshear's royalty interest in coal options actually acquired by AEP would vest at the time of acquisition, even if not vested at the time the interests were created.

Beshear's royalty interest consisted of two separate, alternate interests, as noted above. Advance royalties could be elected, releasing all further claims to the coal in the elected acreage; otherwise, royalties in coal actually mined could be taken. Beshear's "mined" royalty interest, while vesting in enjoyment once coal is mined, was vested in interest only as to coal options owned as of the date of the agreement, and only if Beshear did not elect advance royalties. It could not vest in interest in acreage which might never be acquired by AEP. The future acquisition of coal options by AEP was a condition precedent to Beshear's "mined" royalty interest in any coal in additional acreage. "A condition precedent is one which must happen or not happen before a conditional estate will vest or be enlarged." I.L.E. Estates § 5. A typical vested remainderman has a fee simple interest in an estate uncertain as to enjoyment, but Beshear had an uncertain interest that any coal would ever be mined.

Beshear's advance royalty interest, however, in acreage obtained by him on behalf of AEP, and in acreage independently acquired by AEP, was conditioned not only upon additional options being acquired by AEP, but also upon Beshear making timely election(s). One issue which Beshear's brief does not discuss, but which we find relevant is the effect of paragraph 6 of the 1970 agreement, which states, in part: "At any time *within five years* after AEP has exercised its options ... you may, at your election ... request AEP to pay you[ ] an advance royalty for such coal." (R. 22) (emphasis added). Under the agreement, AEP could exercise the original options assigned to it by Beshear or reassign them to

---

10. In the event that Beshear did not elect advance royalties, the agreement also contained a provision for Beshear to receive minimum annual royalties "in the event that mining operations are not started within three years after any minable tract is put together." (R. 22). It was possible, of course, that no minable tract would ever be put together. Paragraph 7 of the agreement reads in whole:

> If and when AEP installs a coal mine in this coal reserve, and if you have not elected to receive the advance royalty payment for the coal as covered in item 6 above, AEP will pay you a royalty of $0.05 per ton of coal mined, less any other expenses previously incurred by AEP in reimbursing you, in exercising its op-

tions, and in making the advance royalty payment as covered in item 4 above. In the event that mining operations are not started within three years after any minable tract is put together and AEP has exercised its options as hereinabove provided, AEP will pay minimum annual royalties in respect thereof determined by dividing the recoverable tons by 30 and multiplying by two cents per ton, and all such minimum royalties shall be credited at the appropriate time to the five cents for royalties due when coal is actually mined at a rate in excess of such minimum rate or you elect to sell all future interest in such coal pursuant to item 6 above.

(R. 22).

Beshear. If not reassigned to Beshear, the options would be deemed exercised by AEP within three years of Beshear's original assignment, which was required within ninety days of the agreement. Thus, Beshear was required to elect advance royalties, if at all, no later than eight years and ninety days after execution of the 1970 agreement.[11] This limitation is sufficient to avoid the application of the rule against perpetuities in that advance royalties in any acreage acquired independently by AEP, while not vested at the creation of the royalty interest, must necessarily have vested in Beshear within this time period. If not for this limitation on elections, the rule against perpetuities would void Beshear's right to advance royalties in options not then owned by Beshear or AEP at the time of the 1970 agreement.

▇ We conclude that Beshear's royalty interest in *mined* coal, other than in acreage owned by Beshear or AEP at the time of the 1970 agreement, was extinguished because of the elections to receive *advance* royalties. Beshear's advance royalty interest, however, as to royalties on coal options later acquired by AEP and elected by Beshear *within the time period specified in paragraph 6* of the agreement, is not void under the rule. The agreement itself, not the rule against perpetuities, voids Beshear's interest in acreage acquired by AEP for which a timely election was not made.

▇ Finally, as to Beshear's royalty interests in acreage within the coal field *not* acquired by AEP, we conclude that both Beshear's "mined" and advance royalty interests are nonvested and void under the rule against perpetuities.[12] Beshear cites several cases from other jurisdictions which he be-

lieves lead to a contrary result. We will comment on these cases *seriatim*.

Of the cases cited, two are factually similar to the case here: *Denney v. Teel*, 688 P.2d 803 (Okla.1984) and *Commerce Bank of Kansas City, N.A. v. Peabody Coal Co.*, 861 S.W.2d 569 (Mo.Ct.App.1993), *trans. denied*. In *Denney*, the plaintiff brought an action for breach of a contract wherein he was assigned a one-percent overriding royalty in all future mineral leases which the defendant might acquire in a certain county. *Denney*, 688 P.2d at 805. In holding the contract not void under the Kentucky Statute of Frauds,[13] the court went on to comment on the application of the Kentucky rule against perpetuities. The court explicitly declined to determine whether a nonparticipating royalty interest was subject to the Kentucky rule against perpetuities, that being "an issue for the Kentucky courts." *Id.* at 810. The court did comment, however, that "the execution of future oil-and-gas leases is a contingent future event" which would not be void under the Kentucky perpetuities statute, which had been reformed to adopt the wait-and-see approach, thus not voiding interests unless vesting *actually* occurs beyond the perpetuities period. *Id.* at 809. In dicta, the court stated "that non-participating royalty is a presently vested incorporeal hereditament, payment contingent on the execution of leases should not offend the rule." *Id.* This was a "general observation" by the court, we believe referring to the typical nonparticipating royalty interest, which, though contingent on future leases, would not be invalid because the interest is one in property *owned or leased* by the grantor of the royalty interest. *See Hanson v. Ware*, 224 Ark. 430, 274 S.W.2d 359 (1955). It is not clear that the

**11.** As noted *supra*, the period for election of advance royalties apparently expired sometime in late 1977.

**12.** Though not necessary to our holding on the perpetuities issue, we believe that Beshear's claim for royalties on coal in acreage not acquired by AEP, for which no timely election was made, is unsupported by the 1970 agreement. Paragraph 8 of that agreement states, in part: "In the event AEP independently *acquires* coal without your help within the limits of the coal field, then the reserves *in such areas* shall be

included under items 6 and 7 above for the payment of royalties to you." (R. 22) (emphasis added). AEP only agreed to pay royalties to Beshear for coal in acreage it acquired, not for coal in the entire coal field. Notwithstanding Beshear's argument that the agreement gave AEP control over the entire coal field, AEP did not agree to pay *royalties* on the entire coal field.

**13.** The Oklahoma court applied the law of the situs, Kentucky, upon finding that the royalty interest was an interest in real estate. *Id.* at 806.

court would have found the royalty interest in future leases valid under a common law rule against perpetuities, the interest being dependent upon "a contingent future event."

In *Commerce Bank,* the grantors conveyed land to a coal mining company in exchange for on overriding royalty interest of five percent of all coal mined in a certain Kentucky county, within a defined boundary. At the time of the conveyance, neither the mining company nor the grantors owned most of the property within the boundary. Royalties were paid for many years on coal from originally conveyed property as well as after-acquired property. A lawsuit commenced between successors to both parties for further royalty payments on coal mined from the area; the rule against perpetuities was pled as a defense to payment of royalties on coal mined from property acquired after the original conveyance. On appeal from a dismissal in favor of the plaintiff seeking royalty payments, the court stated the issue as "whether the grant of an overriding royalty interest in property in Kentucky not owned by the grantor at the time of the conveyance violates the state's common law rule against perpetuities." *Commerce Bank,* 861 S.W.2d at 571–72. In dismissing the case, the trial court followed a parallel suit involving the same royalty agreement in federal district court in finding that the conveyance "did not create any interest in land." *Id.* at 570, 572. Like *Denney,* this case involved the Kentucky rule against perpetuities, but here the conveyance was subject to the earlier common law version, similar to Indiana's pre–1991 common law rule. On appeal, the mining company argued that the royalty interest was an interest in land under Kentucky law, but was contingent and not certain to vest within the perpetuities period in the after-acquired properties. *Id.* at 572. The conveyance containing no time limitation, unlike Beshear's advance royalty interest which was subject to a time limitation on making elections, the mining company argued that it violated the rule against perpetuities. *Id.* at 573. The *Commerce Bank* court quoted the earlier federal district court opinion which found that the royalty agreement created no interest in land and therefore was not subject to the rule against perpetuities "whether

they cover 'after-acquired' property or not." *Id.* at 573–74. The appellate court, however, did not follow the earlier federal decision. The appellate court held that the royalty agreement was an interest in real property which vested immediately and was not subject to the rule against perpetuities. *Id.* at 576.

In reaching this conclusion, the court cited the *Denney* case, stating that the *Denney* court's "conclusion [was] that the non-participating royalty is . . . an interest that immediately vests when conveyed, and therefore not subject to the rule against perpetuities." *Id.* at 574–75. As discussed above, this is *not* what was decided in *Denney.* In that case, the court stated that the royalty interest in future leases on property not then owned or leased by the grantor of the royalty was dependent upon a contingent future event, but was not void because it *might* vest within the perpetuities period of the Kentucky wait-and-see perpetuities statute. The *Commerce Bank* court quoted the *Denney* court's general discussion regarding nonparticipating royalties which was clearly dicta and not the holding of that case. The court went on to cite several other cases in support, which Beshear also cites: *Hanson v. Ware,* 224 Ark. 430, 274 S.W.2d 359 (1955), *J.M. Huber Corp. v. Square Enters., Inc.,* 645 S.W.2d 410 (Tenn.Ct.App.1982), *Dauphin Island Property Owners Ass'n v. Callon Institutional Royalty Investors,* 519 So.2d 948 (Ala.1988), and *Conway Land, Inc. v. Terry,* 542 So.2d 362 (Fla.1989). None of these cases are on point, as discussed below.

In *Hanson,* a property owner granted a one-sixteenth perpetual royalty in all oil and gas produced by current or future lessees from a specific tract then owned by the grantor. The Arkansas Supreme Court held that the conveyance did not violate the rule against perpetuities as it conveyed a present interest in the land. The court stated that the royalty holder's

estate was doubtless speculative in value, but the uncertainty stemmed from a fundamentally different reason from that which makes an ordinary contingent remainder an estate of doubtful worth. . . . The [royalty holder's] *title being complete,* the

doubt is occasioned not by the possibility that some one else may acquire the property, but by the possibility that there may in fact be no oil and gas within the land.

*Hanson,* 274 S.W.2d at 362 (emphasis added). This case follows the general rule that the royalty being considered real property, it is a presently vested interest once conveyed. We distinguish *Hanson* from the situation in *Commerce Bank, Denney,* and that of the case before us, in that the royalty interest in *Hanson* was granted in property owned by the grantor at the time of conveyance, merely subject to future leases.

In *Huber,* property owners granted a tract of land, reserving a one-half nonparticipating royalty interest in all minerals mined from the property. The court held that the reserved right to receive royalties, under Tennessee law a real property interest, vested immediately in the grantor and did not violate the rule against perpetuities. *Huber,* 645 S.W.2d at 413. This case is likewise distinguishable because the royalty interest was reserved in property owned by the grantor at the time of conveyance and involved no unowned or after-acquired lands.

In *Dauphin,* a property owners association sold a fractional royalty interest in oil, gas, and minerals in certain land, at the time under lease to an oil company, but subject to any future leases, which future leases the association reserved the right to grant. At the time of conveyance, the association owned the larger royalty interest in the property. In an action to quiet title to the property in the association, the court held that

> whether a non-participating royalty interest be construed as an interest in the minerals or as a personal property right in the minerals once they are extracted, it does not violate the rule against perpetuities, because it is a vested interest even though uncertain in the enjoyment.

*Dauphin,* 519 So.2d at 951. Because the royalty interest was granted from a greater property interest owned by the grantor at the time of conveyance, this case, too, is distinguishable from *Commerce Bank,* though cited in support by that court.

In *Conway,* a grantor conveyed title to certain property by deed reserving a one-half royalty interest in oil, minerals, and gas which may be taken from the property conveyed. At the time of conveyance, the grantors had entered into a lease of the oil, mineral, and gas to a third party. In an action for a portion of a condemnation award concerning the property, the Florida Supreme Court held that the reservation of the royalty interest was not limited to the existing lease, but applied to future leases as well, the interest being a perpetual nonparticipating royalty interest. *Conway,* 542 So.2d at 364. The court held that the royalty interest in minerals in the ground was a presently vested interest in real property and as such did not violate the rule against perpetuities. *Id.* at 365. This case is distinguishable from the facts before the court in *Commerce Bank* in the same way that *Huber* is distinguishable.

We agree with AEP that the cases relied upon in *Commerce Bank* and by Beshear, while supporting the general rule that where nonparticipating royalty interests are considered real property interests they vest immediately upon conveyance, do not support the contention that such royalty interests in unowned or after-acquired property also vest immediately. For this reason, we do not find the *Commerce Bank* holding persuasive; indeed, that court characterized the issue as "whether a royalty interest in minerals created prior to the making of the mineral *lease* is subject to the rule [against perpetuities]." *Commerce Bank,* 861 S.W.2d at 574 (emphasis added). As expressed, this issue appears to be similar to the issue decided in *Dauphin* and *Conway,* but was not precisely the issue before the *Commerce Bank* court. The distinct issue in *Commerce Bank* was whether a nonparticipating royalty interest in minerals created before the grantor of the interest owns or controls the property violates the rule against perpetuities. This is exactly the issue before us today. *Commerce Bank* did not clearly decide this question.

■ We hold that, in Indiana, overriding or nonparticipating royalty interests are real property interests which vest immediately in the royalty holder only to the extent that such interests are granted in property owned

by the grantor at the time of conveyance, otherwise such royalty interests will not vest until acquisition by the grantor.

 Finally, Beshear contends that the rule against perpetuities pertains only to estate planning and should not be applied to commercial contracts. Our cases do not so hold. *See Consolidation Coal Co. v. Mutchman,* 565 N.E.2d 1074 (Ind.Ct.App.1990), *trans. denied.* Beshear also argues that the recent revisions to the Indiana rule against perpetuities make it clear that the revised statute does not apply to "a nonvested property interest ... arising out of a nondonative transfer...." Ind.Code § 32–1–4.5–2. This is true, but irrelevant, because the common law rule, applicable here, is not so limited.

### Reformation

 Beshear argues that should this court find the 1970 agreement in violation of the rule against perpetuities, it should also reform the agreement. Beshear cites the recently enacted Uniform Statutory Rule Against Perpetuities, which provides for reformation. Ind.Code Section 32–1–4.5–1(b)(2) requires the court to "reform the disposition by inserting a savings clause that most closely preserves the transferor's plan of distribution and is within the limits of the rule against perpetuities...." However, as discussed above, the new statute does not apply to this action; also, the statute does not apply to nondonative transfers. Ind.Code § 32–1–4.5–2. Therefore, the reformation provisions do not apply in this case.

 Alternatively, Beshear argues that the court's equitable powers may be used to reform the agreement. On this issue our supreme court has stated:

> [R]eformation is "an extreme equitable remedy to relieve the parties of mutual mistake or of fraud."... [T]he party seeking reformation must establish the true intentions of the parties to an instrument, that a mistake was made, that the mistake was mutual, and that the instrument therefore does not reflect the true intentions of the parties.

*Estate of Reasor v. Putnam County,* 635 N.E.2d 153, 158 (Ind.1994). Beshear claims that paragraph 8 of the agreement evidences a mutual mistake, since both parties believed at the time that it was enforceable. Though this contention is debatable considering the parties' long-running legal battle, Beshear has the burden of showing both the mutual mistake and that the instrument does not reflect the parties' true intentions. Beshear admits that the agreement does reflect his true intentions, his mistake being believing paragraph 8 of the agreement to be enforceable as to the entire coal field. The mistake, therefore, is not one of fact, but of law. "[A] long line of Indiana authority has held that reformation may only be had for mistake of fact. It is not available for a mistake of law." *Gierhart v. Consolidated Rail Corp.–Conrail,* 656 N.E.2d 285, 287 (Ind.Ct.App.1995), *trans. denied.*

Beshear cites only one case in support of reforming this agreement: *Atchison v. City of Englewood,* 193 Colo. 367, 568 P.2d 13 (1977). In *Atchison,* the court approved a trial court's reformation of a preemptive rights agreement which was held to violate the rule against perpetuities. The party seeking reformation showed by clear and unequivocal evidence that a mutual mistake occurred where a paragraph had been inserted into the document which had not been discussed by the parties. *Id.* 568 P.2d at 17. The offending paragraph extended the agreement to the parties' heirs, which mistake created a possibility that the interest would not vest within the perpetuities period. *Id.* Unlike in *Atchison,* Beshear has not shown that any portion of the agreement was mistakenly inserted or drafted, or that the wording in any way differed from either his or AEP's intentions. Absent a showing that the agreement does not express the parties' true intentions, reformation is not warranted.

We conclude that Indiana's common law rule against perpetuities voids Beshear's claimed interest in advance royalties in acreage not acquired by AEP, but not his interest in advance royalties in acreage acquired by AEP after the execution of the 1970 agreement because a timely election for ad-

vance royalties was required.[14] The trial court properly granted partial summary judgment for AEP regarding Beshear's claim for advance royalties in acreage not acquired by AEP. However, the trial court erred in granting partial summary judgment for AEP regarding Beshear's claim for advance royalties in acreage independently acquired by AEP because these interests are not voided by the rule against perpetuities.

Affirmed in part and reversed in part.

DARDEN and NAJAM, JJ., concur.

---

14. We do not decide whether Beshear's elections were, in fact, timely.