Grace SHARP, as Administratrix of the Estate of Robert Sharp, Appellant–Defendant,

v.

The TOWN OF HIGHLAND, Northern Indiana Public Service Company, a Subsidiary of NIPSCO Industries, Inc., and Tri–State Coach Lines, Inc., Appellee–Plaintiff.

No. 64A05–9409–CV–371.

Court of Appeals of Indiana.

May 17, 1996.

Saul I. Ruman, David W. Holub, David M. Hamacher, Ruman, Clements, Tobin & Holub, Hammond, Peter L. Benjamin, Mark Van Der Molen, Merrillville, for Appellant.

Paul A. Rake, Sherry L. Clarke, Michael E. O'Neill, Eichhorn, Eichhorn & Link, Hammond, for Appellee and Cross–Appellant.

Harold Abrahamson, Scott R. Bilse, Abrahamson, Reed & Adley, Hammond, for Appellee.

John E. Hughes, Hoeppner, Wagner & Evans, Valparaiso, for Cross–Appellee.

## OPINION

RILEY, Judge.

Plaintiff–Appellant Grace Sharp, as Administratrix of the Estate of Robert Sharp, (the Estate) appeals the trial court's grant of summary judgment in favor of Defendants–Appellees The Town of Highland (Highland) and Northern Indiana Public Service Co. (NIPSCO).

Cross–Appellant NIPSCO appeals the trial court's grant of summary judgment in favor

of Cross–Appellee Tri–State Coach Lines, Inc. (Tri–State).

We affirm in part; and reverse in part.

### *ISSUES*

The Estate raises six issues for our review. We consolidate and restate the issues as:

1. Whether the trial court erred in finding that Highland was immune from liability under IND. CODE 10–4–1–8.

2. Whether the trial court erred in finding that NIPSCO was a civil defense and disaster worker under I.C. 10–4–1–8.

3. Whether the trial court erred in finding, as a matter of law, that there was no evidence of wilful misconduct, gross negligence, or bad faith.

On cross-appeal, NIPSCO raises the re-stated issue of:

4. Whether the trial court erred in granting summary judgment in favor of Tri–State.

### *FACTS AND PROCEDURAL HISTORY*

On November 27 and 28, 1990, an estimated seven inches of rain fell in an eight hour period in Northwest Indiana. As a result, the Little Calumet River began overflowing its banks in Highland. The water crossed Tri–State's parking lot, flowed across Indianapolis Boulevard, and entered into the Wicker Park Manor subdivision.

During the initial stage of the flooding on November 27, Krooswyk Trucking & Excavating, Inc. was engaged to provide sand for flood control. An initial attempt was made to establish a sand barrier across Indianapolis Boulevard, but the water continued to wash the sand away.

At approximately 8:00 a.m. on November 28, Gerald Krooswyk, president of Krooswyk Trucking, suggested to Highland officials that a dike be built across Tri–State's parking lot to save the subdivision from further flooding. The dike would consist of gravel dumped across Tri–State's property from the river's edge along the edge of Indianapolis Boulevard to a high point at the end of the parking lot. The proposed location for the

dike passed directly under NIPSCO's energized overhead power lines, which also crossed Indianapolis Boulevard.

At approximately 10:30 a.m. on November 28th, Highland officials approved the dike location and Krooswyk trucks began dumping gravel to form the dike on the Tri–State parking lot. At approximately 1:10 p.m., Robert Sharp, a Krooswyk employee, began backing his truck onto the pile of gravel forming the dike. After Sharp raised the truck bed, the truck became energized when electricity from the overhead wires arced. Sharp was electrocuted.

On August 21, 1991, the Estate filed suit against both Highland and NIPSCO. The complaint alleged that Highland's negligent acts and NIPSCO's negligent and/or reckless conduct caused Sharp's death.

Highland and NIPSCO filed separate motions for summary judgment, both asserting the immunity defense found in I.C. 10–4–1–8. After a hearing on the motions, the trial court granted summary judgment in favor of Highland and NIPSCO. The Estate now appeals.[1]

### *DISCUSSION AND DECISION*
### STANDARD OF REVIEW

The purpose of summary judgment is to terminate litigation about which there can be no factual dispute and which may be determined as a matter of law. Ind.Trial Rule 56(C); *Fawley v. Martin's Supermarkets, Inc.*, 618 N.E.2d 10, 12 (Ind.Ct.App. 1993), *trans. denied.* The moving party bears the burden of making a prima facie showing that there are no genuine issues of material fact. T.R. 56(C); *Campbell v. Criterion Group*, 613 N.E.2d 423, 428 (Ind.Ct. App.1993), *on reh'g* 621 N.E.2d 342. Once the moving party makes a prima facie showing of the non-existence of a genuine issue of material fact, the burden shifts to the non-moving party to set forth specific facts showing the existence of a genuine issue for trial. T.R. 56(E); *Campbell*, 613 N.E.2d at 428. Summary judgment will be affirmed on appeal if it is sustainable on any theory or basis

---

1. Additional pertinent facts are given below.

found in the evidentiary matter designated to the trial court. *Fawley*, 618 N.E.2d at 12.

## ISSUE ONE: DECLARATION OF A DISASTER

The Estate contends that I.C. 10–4–1–1 et seq., Indiana's Civil Defense and Disaster Law of 1975 (the Act), requires the official declaration of a disaster before the immunity provisions of I.C. 10–4–1–8 become effective.[2] The Estate further contends that there is a genuine issue of material fact as to whether such a declaration was made prior to Sharp's death.

The Act is designed to insure that preparations for disasters or emergencies will be adequate to protect the public peace, health, and safety, and to preserve the lives and property of the people of the state. I.C. 10–4–1–2(a). Accordingly, it provides for: (1) the creation of state and local civil defense departments; (2) authority in the governor and officials of political subdivisions to deal with disasters and emergencies; (3) mutual aid among political subdivisions of the state; and (4) the creation of organizations to deal with disasters or emergencies. *Id.* The Act is further designed to (1) coordinate all civil defense functions of the State with comparable Federal functions; (2) prepare for prompt and efficient rescue, care, and treatment during a disaster; (3) provide for rapid and orderly restoration and rehabilitation after a disaster; (4) clarify and strengthen the role of government in response to disasters; (5) authorize coordination between departments of government; and (6) provide a disaster management system embodying all aspects of pre-disaster preparedness, disaster operations, and post-disaster response. I.C. 10–4–1–2(b).

▪ Generally speaking, the Act is intended to facilitate rescue and remedial measures in response to a disaster. I.C. 10–4–1–3 defines "disaster" as an "occurrence or imminent threat of widespread or severe damage, injury, or loss of life or property resulting from any natural or manmade cause, including but not limited to fire, flood . . . ."

In recognition of the need of government to act promptly and efficiently in response to disasters, the legislature created an immunity from liability for any death or injury to persons or damage to property that may result from disaster relief activities. In pertinent part, I.C. 10–4–1–8(a) provides:

All functions hereunder and all other activities related to civil defense and disaster are hereby declared to be government functions. Neither the state nor any political subdivision thereof nor any other agencies of the state or political subdivision thereof, nor, except in cases of wilful misconduct, gross negligence, or bad faith, any civil defense and disaster worker complying with or reasonably attempting to comply with this chapter, or any order, rule or regulation promulgated pursuant to the provisions of this chapter, or pursuant to any ordinance relating to blackout or other precautionary measures enacted by any political subdivision of the state, shall be liable for the death of or injury to persons, or for damage to property, as a result of such activity. . . .

The Estate contends that I.C. 10–4–1–8 should be strictly construed as it is in derogation of the common law right to sue the government. The Estate recognizes that I.C. 10–4–1–8 provides for immunity in the case of disaster emergencies. However, it argues that the immunity provisions become effective only after a formal declaration of a disaster by the proper town official. In support of its argument, the Estate cites to I.C. 10–4–1–23(b), which provides that "[t]he effect of a declaration of a local disaster emergency is to activate the response and recovery aspects of any and all applicable local or interjurisdictional disaster emergency plans and to authorize the furnishing of aid and assistance under them."

▪ We agree that strict construction is generally appropriate in ascertaining the meaning of ambiguous statutes which are in derogation of the common law. However, when the language of a statute is plain and unambiguous, a court has no power to construe the statute for the purpose of limiting

---

**2.** The title of the chapter was amended by P.L. 21–1991, SEC. 5. The chapter is now known as the "Emergency Management and Disaster Law."

or extending its operation. *C & C Oil Co., Inc. v. Ind. Dep't of State Revenue*, 570 N.E.2d 1376, 1380 (Ind.Tax Ct.1991).

■■ I.C. 10–4–1–8 neither states nor implies that immunity is activated by a formal declaration of an emergency disaster or conditioned upon strict compliance with other portions of the Act. The plain language clearly establishes immunity from liability for the death or injury to persons arising out of "[a]ll functions hereunder and all other activities relating to civil defense and disaster." We will not construe an unambiguous statute for the purpose of limiting the clear grant of immunity.

The unambiguous grant of immunity in I.C. 10–4–1–8 is not qualified by the language of I.C. 10–4–1–23. Furthermore, the grant of immunity is not inconsistent with I.C. 10–4–1–23, which neither mandates the official declaration of an emergency nor refers to immunity. I.C. 10–4–1–23 simply activates plans of response and recovery and authorizes recovery of financial assistance from state and federal governments.

■ In the present case, the designated evidence establishes the Little Calumet River overflowed its banks. The resulting flood, which was a disaster under I.C. 10–4–1–1 et seq., threatened the safety and property of the Wicker Park Manor subdivision's residents. The evidence also establishes that Highland sought to deal with the flood by building the dike and shutting down electricity to the subdivision. The evidence is sufficient to establish that Sharp, under Highland's direction, was killed while helping to stop the floodwater. Under I.C. 10–4–1–8, Highland may not be held liable for Sharp's death.

### ISSUE TWO: APPLICATION OF I.C. 10–4–1–8 TO NIPSCO

The Estate contends that the trial court erred in finding, as a matter of law, that NIPSCO was immune under I.C. 10–4–1–8. The Estate argues that (1) NIPSCO was not a "civil defense or disaster worker" granted immunity under I.C. 10–4–1–8; (2) NIPSCO's employees were not under Highland's supervision when they decided not to turn off the electricity in the lines above the Tri-State parking lot (3) NIPSCO was negligent because it had notice that Sharp was in imminent danger of electrocution; and (4) NIPSCO employees were acting in a dual capacity at the time of Sharp's death.

### A. THE DEFINITION OF A "CIVIL DEFENSE OR DISASTER WORKER"

I.C. 10–4–1–8(a) gives immunity to the state, political subdivisions, agencies of the state or political subdivision and any civil defense and disaster worker. The Estate argues, and NIPSCO concedes, that NIPSCO is not the state, a political subdivision, or agency. The Estate also argues that NIPSCO does not qualify as a "civil defense and disaster worker" as the term is defined in I.C. 10–4–1–8. Subsection (c) of the statute states that a "civil defense and disaster worker" includes "any full or part-time paid, volunteer, or auxiliary employee of this state, or ... [other government entity] ..., or any agency or organization, performing civil defense and disaster services ... [while] ... subject to the control of, or pursuant to a request of, the state government or any political subdivision thereof." The Estate contends that NIPSCO is not an "employee," as such term refers to individuals, not corporations. The Estate reasons that the immunity given to NIPSCO employees does not extend to NIPSCO.

■ In granting summary judgment, the trial court found that NIPSCO employees were "entitled to immunity from claims of negligence arising out of their work as emergency management workers ... Under *respondeat superior*, NIPSCO is therefore immune from the claims of plaintiff in this case." (R. 781–782). We agree. The Estate attempts to impose liability upon NIPSCO as a corporate entity for its employees' alleged negligence upon the doctrine of *respondeat superior*. If NIPSCO employees are immune from liability, then there is no basis for imputing negligence to NIPSCO.

### B. CONTROL OVER NIPSCO EMPLOYEES

■ The Estate contends that there is a genuine issue of material fact as to whether

or not NIPSCO employees were under the control of, or acting at the request of, Highland at the time Sharp was electrocuted. Thus, the Estate argues that the trial court erred in finding that NIPSCO employees were immune from liability at the time of Sharp's death.

In support of its summary judgment motion, NIPSCO designated portions of the deposition of Gene Shayotovich, a NIPSCO official. In his deposition, Shayotovich indicated that "we [NIPSCO employees] were called and asked to shut the power off. . . ." He further stated that "the crux of it was that they [Highland officials and employees] wanted to shut the power off into all those homes down there, but they wanted to keep the pump station running because it was still pumping." In response to NIPSCO's designated evidence, the Estate designated portions of the depositions of various Highland officials and employees. Mike Pipta, a Highland Public Works employee at the scene of the flood, stated that NIPSCO approached him with options, he selected an option, and no other discussion occurred. William Haas, the Highland Fire Chief, stated that he did not direct NIPSCO employees to do anything. He further stated that he relied upon NIPSCO's expertise in determining the dangers of electricity and what to do about them. Bill Cameon, the Highland Electrical Inspector, stated that no order was given to NIPSCO because Highland was depending on NIPSCO's expertise.

At first glance, the Estate's designated evidence appears to establish a question of fact as to whether NIPSCO was under Highland's control at the flood scene. However, a reading of Haas's deposition in context, as provided by NIPSCO's designation of additional pages from the deposition, shows that although Haas did not tell NIPSCO employees how to do the job, he did tell them what to do. Furthermore, in designating which option was to be followed, Pipta demonstrated that Highland was in control of the situation. Its deference to NIPSCO's expertise did not lessen the fact that it had ultimate control.

## C. NEGLIGENCE DUE TO NOTICE OF IMMINENT DANGER

The Estate notes that a power company has a duty to safely insulate electric power lines in places where the general public may come into contact with the lines. *Petroski v. Northern Indiana Public Service Co.*, 354 N.E.2d 736, 741 (Ind.Ct.App.1976), *trans. denied.* The Estate further notes that an insulated covering is not required when lines are sufficiently isolated so that the general public could not be reasonably expected to come into contact with them. *Southern Indiana Gas and Electric Co. v. Steinmetz*, 177 Ind. App. 96, 377 N.E.2d 1381, 1383 (1977), *trans. denied.* The Estate also notes that there are exceptions to the latter rule when (1) the facts indicate that the utility had actual knowledge or notice of circumstances that create an imminent danger to an individual; and (2) when the utility knows that a particular segment of the population will be regularly exposed to uninsulated wires. *Northern Indiana Public Service Co. v. East Chicago Sanitary District*, 590 N.E.2d 1067, 1074 (Ind.Ct.App.1992); *Brown v. Northern Indiana Public Service Co.*, 496 N.E.2d 794 (Ind.Ct.App.1986), *reh'g. denied, trans. denied.*

The Estate contends that NIPSCO employees were put on notice of the imminent danger to Krooswyk truck drivers, and were negligent in not turning off the electricity over the Tri–State parking lot. This argument fails to recognize that, whether negligent or not, NIPSCO and its employees are immune from liability under I.C. 10–4–1–8.

## D. DUAL EMPLOYMENT

The Estate contends that there is a question of fact as to whether NIPSCO employees were acting in a dual capacity. In support of this contention, the Estate cites *Transport Motor Express, Inc. v. Smith*, 262 Ind. 41, 311 N.E.2d 424 (1974), and related cases.

*Transport*, and the other cases cited by the Estate, are worker's compensation cases. The Estate makes no attempt to explain how the cases are relevant to the issue before us. Furthermore, we do not find them to be relevant.

## ISSUE THREE: WILFUL MISCONDUCT, GROSS NEGLIGENCE, OR BAD FAITH

■■■ The Estate contends that the trial court erred in finding that there was no designated evidence to indicate that "NIPSCO's alleged acts or omissions arose to the level of wilful misconduct, gross negligence, or bad faith." (R. 782). The Estate points out that NIPSCO did not address the issue of wilful misconduct, gross negligence, or bad faith in its summary judgment motion. The Estate questions the propriety of disposing of this issue by summary judgment.

I.C. 10–4–1–8 does not provide unlimited immunity to civil defense and disaster workers. The statute precludes immunity in "cases of wilful misconduct, gross negligence, or bad faith."

■■■ In a summary judgment motion, the movant has the initial burden of establishing its entitlement to a judgment, as a matter of law. T.R. 56(C). The nonmovant may rest upon the pleadings until the movant meets this burden. T.R. 56(E); *Winbush v. Memorial Health Systems, Inc.*, 581 N.E.2d 1239, 1243 (Ind.1991).

■■■ In the present case, NIPSCO had the initial burden of proving that it was entitled to immunity under the statute, i.e. that it came within the purview of the statute and did not engage in acts constituting wilful misconduct, gross negligence, or bad faith. NIPSCO succeeded in showing that it qualifies for immunity from liability for any negligent acts; it failed, however, to show that its acts did not constitute wilful misconduct, gross negligence, or bad faith. Accordingly, the trial court improperly made a finding on this matter.[3]

## ISSUE FOUR: SUMMARY JUDGMENT IN FAVOR OF TRI–STATE

Following the filing of the Estate's complaint, the trial court allowed it to add Tri–State as a party defendant. Tri–State responded by filing a motion for dismissal and/or summary judgment. In support of the motion, Tri–State filed a memorandum alleging *inter alia* that the death of Sharp was unforeseeable.

NIPSCO responded and designated evidence that showed that in enlarging its parking lot, Tri–State had lowered and partially removed part of a railroad embankment used as a levee along the bank of the Little Calumet River. NIPSCO also designated evidence that showed that on November 27–28, 1990, the Little Calumet River overflowed its banks and flooded through the place where the railway embankment had been rebuilt. Sharp was electrocuted while fighting the flood. NIPSCO argued that the designated evidence raised a genuine issue of material fact as to whether Tri–State's actions were a proximate cause of Sharp's death.

NIPSCO's response was filed more than thirty days after the filing of Tri–State's motion; however, the trial court recognized that the late filing resulted from failure of notice.[4] The trial court ultimately granted summary judgment in favor of Tri–State. In doing so, it did not address the question of whether Tri–State's destruction of the embankment was a proximate cause of Sharp's death.[5] However, we will affirm the trial court's grant of summary judgment if it is sustainable on any theory or basis found in the record. *Fawley*, 618 N.E.2d at 12; *Watson v. Ziegert*, 616 N.E.2d 785, 787 (Ind.Ct. App.1993).

■■■ An indispensable element of a negligence action is that the act complained of must be the proximate cause of the plaintiff's injuries. *Havert v. Caldwell*, 452 N.E.2d 154, 158 (Ind.1983). A fundamental element of proximate cause is that the injury

---

3. A determination as to whether a party is guilty of wilful or wanton misconduct is typically a function of the trier of fact. *Medical Licensing Bd. of Indiana v. Ward*, 449 N.E.2d 1129, 1141 (Ind.App.Ct.1983), *trans. denied.*

4. The trial court was authorized to alter the time limits of the rule upon a showing of cause. T.R. 56(I).

5. The trial court based its determination on its finding that Sharp was an invitee at the time of his death. The trial court did not address the question of whether Tri–State's prior activities were a cause of death.

or consequence of the wrongful act is reasonably foreseeable at the time of the act. *Lever Brothers Co. v. Langdoc,* 655 N.E.2d 577, 584 (Ind.Ct.App.1995). The question is whether the wrongful act is a proximate cause rather than a remote cause. *Id.*

In the present case, the material facts are undisputed. Flooding occurred near the embankment that was rebuilt by Tri–State. The disaster workers decided to build a dike that would extend from the river's edge, out to and along the west edge of Indianapolis Boulevard and across Tri–State's parking lot, to a high point at the southeast corner of the lot. This high point was under NIPSCO's overhead power lines. Sharp, as one of the disaster workers, drove a semi truck with a twenty-four foot dump load to help build the dike higher. He then drove the semi truck up a gravel ramp and raised the twenty-four foot bed. Electricity arced to the truck, Sharp jumped out from the truck to the ground, staggered, fell into the water, and was electrocuted.

■ Considering all of the circumstances, Tri–State's act cannot as a matter of law be the proximate cause of Sharp's death. At the time of the act, it was not foreseeable that the act would result in the death. Specifically, Tri–State could not have reasonably foreseen that an unprecedented thunderstorm would dump approximately eight inches of rain within seven hours. Also, Tri–State could not have foreseen that disaster workers would decide to construct a dike across the parking lot to a point directly underneath NIPSCO's overhead lines. Furthermore, it could not have foreseen that the workers would build a ramp to the dike which would raise a disaster worker's truck to a height where arcing of electricity from overhead lines would cause injury.

### CONCLUSION

The trial court correctly determined that Highland was immune from liability under the Act. Accordingly, the grant of summary judgment in favor of Highland is correct. The grant of summary judgment is affirmed.

The trial court also correctly determined that, as a matter of law, NIPSCO was a civil defense and disaster worker under the Act. Accordingly, the court was correct in determining that NIPSCO was immune from liability for its allegedly negligent acts. To the extent that the court's grant of summary judgment dealt with this question of law, it is affirmed.

However, the trial court erred in making a determination on the question of wilful misconduct, gross negligence, and bad faith. The question was not raised in NIPSCO's summary judgment motion. Furthermore, it is a question for the trier of fact. To the extent that the court's grant of summary judgment dealt with this issue, it is reversed.

Finally, the trial court correctly granted summary judgment in favor of Tri–State. The grant of summary judgment is affirmed.

DARDEN and NAJAM, JJ., concur.