**NORTHERN INDIANA PUBLIC SERVICE CO., Appellant–Defendant,**

v.

**Grace SHARP, As the Administratrix of the Estate of Robert Sharp, Appellee–Plaintiff.**

No. 64A03–9807–CV–320.

Court of Appeals of Indiana.

July 31, 2000.

Paul A. Rake, Sherry L. Clarke, Michael E. O'Neill, Eichhorn & Eichhorn, Hammond, Indiana, Attorneys for Appellant.

David W. Holub, David M. Hamacher, Ruman, Clements, Tobin & Holub, Hammond, Indiana, Attorneys for Appellee.

## OPINION

BAILEY, Judge

### Case Summary

Appellee–Plaintiff Grace Sharp ("Sharp"), as Administratrix of the Estate of Robert Sharp ("Robert"), filed a complaint for wrongful death against the following: the Town of Highland, Indiana ("Highland"); Tri–State Coach Lines, Inc. ("Tri–State"); and, Appellant–Defendant

Northern Indiana Public Service Company ("NIPSCO"). The trial court entered summary judgment in favor of all defendants. Sharp appealed the trial court's decision. On appeal, we affirmed the trial court's grant of summary judgment in favor of Highland and Tri–State. *Sharp v. Town of Highland,* 665 N.E.2d 610 (Ind. Ct.App.1996) (hereinafter referred to as *"Sharp I"*). As to NIPSCO, we reversed that portion of the trial court's grant of summary judgment that dealt with the question of willful and wanton misconduct, gross negligence, and bad faith. The ensuing jury trial resulted in a verdict in favor of Sharp, and damages were assessed in the sum of $750,000.00. NIPSCO now appeals that verdict. We reverse.

### Issues

NIPSCO raises three issues on appeal, of which we find the following two restated issues to be dispositive:

I. Whether the trial court admitted evidence that was precluded by this Court's previous judgment;

II. Whether the trial court erred in denying NIPSCO's Motion for Judgment on the Evidence.[1][2]

### Facts and Procedural History

The facts as set forth in *Sharp I* are as follows:

1. NIPSCO presented the following issues on appeal:
 A. Whether the trial court erred in imposing legal duties upon NIPSCO which are contrary to the Indiana Emergency Management and Disaster Act, I.C. 10–4–1.
 B. Whether the trial court erred in allowing expert testimony which stated legal conclusions at variance with the applicable statute and prior order of the Court of Appeals.
 C. Whether the trial court erred in denying NIPSCO's Motion for Judgment on the Evidence and its Motion to Correct error.
 (Appellant's Brief at 1.)

2. Additionally, Sharp raised the following issue by way of cross-appeal:

On November 27 and 28, 1990, an estimated seven inches of rain fell in an eight hour period in Northwest Indiana. As a result, the Little Calamut River began overflowing its banks in Highland. The water crossed Tri–State's parking lot, flowed across Indianapolis Boulevard, and entered into the Wicker Park Manor subdivision.

During the initial stage of the flooding on November 27, Krooswyk Trucking & Excavating, Inc. was engaged to provide sand for flood control. An initial attempt was made to establish a sand barrier across Indianapolis Boulevard, but the water continued to wash the sand away.

At approximately 8:00 a.m. on November 28, Gerald Krooswyk, president of Krooswyk trucking, suggested to Highland officials that a dike be built across Tri–State's parking lot to save the subdivision from further flooding. The dike would consist of gravel dumped across Tri–State's property from the river's edge along the edge of Indianapolis Boulevard to a high point at the end of the parking lot. The proposed location for the dike passed directly under NIPSCO's energized overhead power lines, which also crossed Indianapolis Boulevard.

. . . .

4. Under the 1985 Comparative Fault Act, which permits a defendant, by affirmative defense, to ask the jury to compare its fault against that of the "claimant", other defendants, and permissible nonparties, did the Trial Court err in instructing the jury to assess the fault of the deceased in this wrongful death case, where the deceased, by law, was not the "claimant" and was not identified as a nonparty?

(Appellee's Brief at 1.) However, here, where we conclude that there was no duty owed to Robert by NIPSCO, and thus that the trial court committed error when it denied NIPSCO's motion for judgment on the evidence, we do not reach the merits of Sharp's cross-appeal.

At approximately 10:30 a.m. on November 28th, Highland officials approved the dike location and Krooswyk trucks began dumping gravel to form the dike on the Tri–State parking lot. At approximately 1:10 p.m., Robert Sharp, ["Robert"] a Krooswyk employee, began backing his truck onto the pile of gravel forming the dike. After [Robert] raised the truck bed, the truck became energized when electricity from the overhead wires arced. [Robert] was electrocuted.

On August 21, 1991, [Robert] filed suit against both Highland and NIPSCO. The complaint alleged that Highland's negligent acts and NIPSCO's negligent and/or reckless conduct caused [Robert]'s death.

Highland and NIPSCO filed separate motions for summary judgment, both asserting the immunity defense found in I.C. 10–4–1–8. After a hearing on the motions, the trial court granted summary judgment in favor of Highland and NIPSCO . . . . .

*Sharp I*, 665 N.E.2d at 613. In *Sharp I* we held as follows:

The trial court correctly determined that Highland was immune from liability under the Act [Indiana's Civil Defense and Disaster Law of 1975]. Accordingly, the grant of summary judgment in favor of Highland is correct. The grant of summary judgment is affirmed.

The trial court also correctly determined that, as a matter of law, NIPSCO was a civil defense and disaster worker under the Act. Accordingly, the [trial] court was correct in determining that NIPSCO was immune from liability for its allegedly negligent acts. To the extent that the court's grant of summary judgment dealt with this question of law, it is affirmed.

However, the trial court erred in making a determination on the question of willful misconduct, gross negligence, and bad faith. The question was not raised in NIPSCO's summary judgment motion. Furthermore, it is a question for the trier of fact. To the extent that the court's grant of summary judgment dealt with this issue, it is reversed.

Finally, the trial court correctly granted summary judgment in favor of Tri–State. The grant of summary judgment is affirmed.

*Id.* at 618.

A jury trial in the cause of Sharp versus NIPSCO was commenced on March 30, 1998. The facts, as further developed at trial and most favorable to the verdict, are as follows: Throughout the night of November 27th, Krooswyk Trucking & Excavating, Inc. ("Krooswyk Trucking") and employee Robert dumped sand to erect a barrier across Indianapolis Boulevard. (R. 1952–53, 1957.) At approximately 2:00 a.m., the Town began evacuating residents of the Wicker Park subdivision who were located east of Indianapolis Boulevard. (R. 809–10, 854.) Meanwhile, the sand barrier continued to be washed away by rising waters. (R. 1953.) Between 8:00 and 9:00 a.m. of the following morning, Gerald Krooswyk ("Krooswyk"), of Krooswyk Trucking, and Robert discussed the possible locations of an additional dike with town officials. (R. 1958–62.) The proposal to build an additional dike was approved by town officials between 10:30 and 11:00 a.m. (R. 1940, 1962, 1964.)

The first load of gravel for the new dike (hereinafter referred to as the "Gravel Dike") arrived at the flood scene shortly after 11:00 a.m. (R. 1962, 1964.) The Gravel Dike passed directly under NIPSCO's energized overhead lines. (R. 1964.) Before construction of the Gravel Dike began, Krooswyk Trucking did not discuss with the town officials shutting off the power to these overhead lines. (R. 1964.) At approximately the same time that the construction on the Gravel Dike commenced, NIPSCO's line supervisor, Gene Shayatovich ("Shayatovich"), arrived at the command center, which was set up on the Indianapolis Boulevard overpass bridge. (R. 902, 953.) The construction

site where the Gravel Dike was being built could be seen from this command center. (R. 863.)

At this time, Shayatovich, Fire Chief Haas ("Fire Chief"), and town officials Mike Pipta ("Pipta") and William Cameon ("Cameon") discussed electrical concerns in the Wicker Park homes becoming flooded. (R. 863, 867, 902.) The Fire Chief had reports that firemen who were attempting to evacuate Wicker Park had felt a current while in the homes. (R. 865.) The Fire Chief was also concerned about the potential for NIPSCO's electricity igniting fuel from underground tanks. (R. 853.) Accordingly, the Fire Chief requested that NIPSCO shut off power to the entire flooded area, which included the area of the Gravel Dike. (R. 864, 922.) However, Pipta requested that NIPSCO leave the power on at the pump station because it was continuing to pump out flood water. (R. 866.) Additionally, Cameon testified that town officials wanted the street lights to be left on for security reasons. (R. 939–40.) The town officials and Shayatovich devised a plan whereby electric power to the Wicker Park homes would be cut, but service would continue to the pumping station and street lights. (R. 939–40, 1516–19, 1589, 1616, 1618, 1619.) At approximately 12:00 p.m., a NIPSCO line crew, consisting of Mr. Walters ("Walters") and Mr. Laws ("Laws") arrived at the command center. (R. 1106.) Traveling by boat, Walters and Laws began the process of de-energizing the cut-out fuses located in the flooded subdivision. (R. 1126–28.)

While NIPSCO workers de-energized the power to the subdivision, Krooswyk Trucking continued its construction of the Gravel Dike. Robert was in the process of dumping his second load of gravel when his truck bed came into contact with NIPSCO's overhead power lines. (R. 792–93.) Electricity traveled through the truck's metal bed to the tires, which began to smolder and smoke. (R. 796–97; 2061–62). Robert jumped from the truck onto

the wet stone surface, then into the water, which resulted in his electrocution. (R. 798–99; Supp. R. 45.)

At trial, NIPSCO moved for judgment on the evidence both at the end of Sharp's case-in-chief and again at the close of all the evidence. (R. 408–12, 527–28.) The trial court denied both motions. (R. 530.) Thereafter, NIPSCO filed a motion to correct errors, which the trial court denied. (R. 539–51, 626–28.) This appeal followed.

## Discussion and Decision

*I. Whether the trial court admitted evidence that was precluded by this Court's previous judgment*

NIPSCO contends that the trial court erred by permitting Sharp to raise issues of negligence that were not presented to this Court on Sharp's prior appeal. (Appellant's Brief at 17.) Specifically, NIPSCO alleges that it was error for the trial court to consider testimony about NIPSCO's policies regarding pre-emergency planning and training because Sharp had not raised this issue in response to NIPSCO's motion for summary judgment. (Appellant's Brief at 17.) NIPSCO relies on the doctrines of the law of the case and res judicata in support of its arguments.

### A. The Doctrines of the Law of the Case and Res Judicata

The law of the case doctrine mandates that when an appellate court decides a legal issue, both the trial court and the court on appeal are bound by that determination in any subsequent appeal involving the same case and relevantly similar facts. *Williams v. State*, 715 N.E.2d 882, 886 (Ind.Ct.App.1999). The doctrine's purpose is to minimize unnecessary relitigation of the legal issues once they have been resolved by an appellate court. *Id.* In *State v. Lewis*, our supreme court further noted that the law of the case doctrine " 'merely expresses the practice of courts generally to refuse to reopen what has been decided, not a limit on their power.' " 543 N.E.2d 1116, 1118 (Ind. 1989) (quoting *Christianson v. Colt Indus-*

*tries Operating Corp.,* 486 U.S. 800, 816–818, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)). When new facts are elicited on remand to the trial court that materially affect the questions at issue, the trial court may apply the law to the new facts. *Estate of Martin by Martin v. Consolidated Rail Corp.,* 667 N.E.2d 219, 220 (Ind.Ct. App.1996). Moreover, a trial court may, upon remand after reversal of an order of summary judgment, recognize such additional facts as are dispositive of the case and rule accordingly. *Id.*

 The doctrine of res judicata consists of two concepts, claim preclusion and issue preclusion. *Wedel v. American Electric Power Service Corp.,* 681 N.E.2d 1122, 1131 (Ind.Ct.App.1997). Claim preclusion applies where a final judgment on the merits has been rendered which acts as a complete bar to a subsequent action on the same issue or claim between those parties and their privies. *Id.* Issue preclusion bars the subsequent relitigation of the same fact or issue where that fact or issue was necessarily adjudicated in a former suit and the same fact or issue is presented in a subsequent action. *Id.* Where issue preclusion applies, the previous judgment is conclusive only regarding those issues actually litigated and determined therein. *Id.* Res judicata provides that a judgment on the merits is an absolute bar to a subsequent action between the same parties on the same claim. *Brougher Agency, Inc. v. United Home Life Ins. Co.,* 622 N.E.2d 1013, 1016 (Ind.Ct.App.1993).

### B. Analysis

 In the appeal taken from the trial court's grant of summary judgment in favor of NIPSCO, our court affirmed that portion of the trial court's determination that NIPSCO was a civil defense and disaster worker under Indiana's Civil Defense and Disaster Law of 1975 (the "Act"). Accordingly, we held that NIPSCO was immune from liability for its *allegedly* negligent acts. However, we specifically reversed that portion of the

trial court's judgment as it may have applied to the questions of willful and wanton misconduct, gross negligence, and bad faith, as judgment on such issues had not been sought in NIPSCO's motion for summary judgment.

As between Sharp and NIPSCO, our previous ruling did not amount to a final judgment on the merits as it related to willful and wanton misconduct, gross negligence, and bad faith, and therefore, did not trigger the res judicata concept of claim preclusion. However, the res judicata concept of issue preclusion did serve to limit the issues available for further litigation. Specifically, the issue of whether NIPSCO was a civil defense and disaster worker under the Act had already been determined, and thus was not available for further litigation upon remand. Applying the law of the case doctrine renders the same result; namely, that NIPSCO was acting as a civil defense and disaster worker and therefore was not liable for its *allegedly* negligent acts. Nevertheless, neither issue preclusion nor the law of the case doctrine serve to limit the introduction of evidence which is relevant to a determination of NIPSCO's alleged willful misconduct, gross negligence, or bad faith, an issue expressly reserved by our prior opinion.

On remand, Sharp raised the issue of whether NIPSCO's lack of pre-emergency planning and training amounted to gross negligence or willful or wanton misconduct. In support of this contention, Sharp also elicited facts not present in *Sharp I* regarding NIPSCO's duties at the flood scene and NIPSCO's knowledge of the risks posed to Krooswyk Trucking employees. Contrary to NIPSCO's argument on appeal, we find that neither the new issue nor the additional facts offended the doctrines of law of the case or res judicata. Rather, the issue of NIPSCO's pre-emergency planning and training was impliedly reserved upon remand as was the solicitation of additional facts essential to determine NIPSCO's duties and knowledge of

risks as they bore on NIPSCO's willful or wanton misconduct. *See Herrell v. Casey,* 609 N.E.2d 1145, 1146 (Ind.Ct.App.1993) (holding in part that whether a trial court has jurisdiction to make additional factual inquiries or to hear new issues depends upon what issues are decided upon appeal and what issues are expressly or impliedly reserved upon remand).

NIPSCO further contends that at trial Sharp simply "recharacterize[d]" negligence evidence as evidence of gross negligence or willful or wanton misconduct, and in the process usurped NIPSCO's statutory immunity in order to revisit issues of negligence already adjudicated. (Appellant's Brief at 17–18.) NIPSCO has misinterpreted, and accordingly misapplied, our previous ruling. In *Sharp I,* we held in part that "NIPSCO was immune from liability for its allegedly negligent acts ... [,]" not that NIPSCO was not negligent. Therefore, neither Indiana Code section 10–4–1–8, nor the doctrines of law of the case or res judicata have been rendered ineffective simply because the jury was permitted to consider NIPSCO's pre-emergency planning and training, or lack thereof, or the additional facts raised at trial pertaining to NIPSCO's duty or knowledge of risks. Simply stated, the new issue was not previously adjudicated and the additional facts, even if repetitive, are necessary to determine whether NIPSCO's conduct amounted to gross negligence or willful and wanton misconduct. *See Conder v. Hull Lift Truck, Inc.,* 435 N.E.2d 10, 18 (Ind.1982) (stating that it is the *"probability* or *likelihood* of injury which justifies the labeling of the defendant's conduct as reckless or wanton, as opposed to merely negligent.") (emphasis in original). Based on the foregoing, we find that the trial court did not err when it admitted evidence of NIPSCO's emergency planning and training procedures or evidence of NIPSCO's duties and knowledge at the time of the flood. Evidence relevant to the above referenced issues was both impliedly reserved and essential to determine whether NIPSCO's conduct amounted to gross negligence or willful and wanton misconduct.

## II. Whether the trial court abused its discretion when it denied NIPSCO's Motion for Judgment on the Evidence

At the close of Sharp's case, and again at the end of trial, NIPSCO moved for judgment on the evidence. NIPSCO argued at trial, and now contends, that the trial court erred in failing to grant its motion for judgment on the evidence because Sharp "failed to carry her burden of proving that NIPSCO was guilty of willful and wanton misconduct or gross negligence." (R. 408.) In essence, NIPSCO's argument is twofold: (1) that Sharp failed to prove that NIPSCO had actual knowledge that Krooswyk Trucking was building the Gravel Dike in close proximity to NIPSCO's overhead power lines, and (2) that NIPSCO's pre-emergency planning and training plans did not amount to willful and wanton misconduct or gross negligence.

### A. Standard of Review—Judgment on the Evidence

 The purpose for judgment on the evidence is to test the sufficiency of the evidence. *Zemco Manufacturing, Inc. v. Pecoraro,* 703 N.E.2d 1064, 1071 (Ind. Ct.App.1998), *trans. denied.* The grant or denial of a motion for judgment on the evidence is within the broad discretion of the trial court and will be reversed only for an abuse of that discretion. *Id.* Indiana Trial Rule 50 reads, in pertinent part, as follows:

(A) Judgment on the Evidence—How Raised—Effect. Where all or some of the issues in a case tried before a jury or an advisory jury are not supported by sufficient evidence or a verdict thereon is clearly erroneous as contrary to the evidence because the evidence is insufficient to support it, the court shall withdraw such issues from the jury and enter judgment thereon or shall enter

judgment thereon notwithstanding a verdict.

As stated in *Liberty Mutual Ins. Co. v. Blakesley,* 568 N.E.2d 1052 (Ind.Ct.App. 1991):

> On appeal, we use the same standard of review as the trial court in determining the propriety of a judgment on the evidence. When the trial court considers a motion for judgment on the evidence, it must view the evidence in a light most favorable to the non-moving party. Judgment may be entered only if there is no substantial evidence or reasonable inferences to be drawn therefrom to support an essential element of the claim.

*Id.* at 1057. When reviewing a trial court's ruling on a motion for judgment on the evidence, we examine the evidence and the reasonable inferences most favorable to the plaintiff from a quantitative as well as qualitative perspective. *Montgomery Ward & Co. v. Gregg,* 554 N.E.2d 1145, 1150 (Ind.Ct.App.1990). Quantitatively, evidence may fail only where there is none at all. *Carbo, Inc. v. Lowe,* 521 N.E.2d 977, 980 (Ind.Ct.App.1988). Qualitatively, however, it fails when it cannot reasonably be said that the intended inference may logically be drawn therefrom. *Id.* The failure of inference may occur as a matter of law when the intended inference can rest on no more than speculation or conjecture. *Id.* A judgment on the evidence is proper only when there is a total absence of evidence in favor of the plaintiff; that is, that the evidence is without conflict and is susceptible of only one inference and that inference is in favor of the defendant, or the inference intended to be proven by the evidence cannot logically be drawn from the proffered evidence without undue speculation. *Montgomery Ward,* 554 N.E.2d at 1150.

### B. Negligence

■■■ In the instant case, for Sharp to recover on a theory of negligence, she must establish a duty on the part of NIPSCO to conform its conduct to a standard of care arising from its relationship with Robert, a failure of NIPSCO to conform its conduct to the requisite standard of care required by the relationship and an injury to Robert proximately caused by the breach. *See Town of Highland v. Zerkel,* 659 N.E.2d 1113, 1120 (Ind.Ct.App. 1995). Whether NIPSCO breached a duty and whether the breach proximately caused injury to Robert are generally questions to be determined by the trier of fact. *See Bamberger & Feibleman v. Indianapolis Power & Light Co.,* 665 N.E.2d 933, 938 (Ind.Ct.App.1996). However, whether a duty of care exists is a question of law for the courts to decide. *Town of Highland,* 659 N.E.2d at 1120. A duty of care will be found by the courts where reasonable persons would recognize it and agree that it exists. *Stump v. Commercial Union,* 601 N.E.2d 327, 332 (Ind.1992). Moreover, a determination of whether a duty exists involves the balancing of three factors: (1) the relationship between the parties; (2) the reasonable foreseeability of harm to the person injured; and (3) public policy concerns. *Id.* (citing *Webb v. Jarvis,* 575 N.E.2d 992, 995 (Ind.1991)).

Here, as discussed *infra,* our prior decision serves to limit the liability of NIPSCO to those acts, if any, that amounted to willful or wanton misconduct or gross negligence. Our supreme court has described willful or wanton misconduct as follows:

> [The] *probability* or *likelihood* of injury which justifies the labeling of the defendant's conduct as reckless or wanton, as opposed to merely negligent.

*Conder,* 435 N.E.2d at 18. Our supreme court has further noted the following definition of gross negligence:

> BLACK'S LAW DICTIONARY at 931 (5th Ed.1979) generally defines the term "gross negligence" as the "intentional failure" to perform a duty "in reckless disregard of the consequences as affecting the life or property of another."

*Stump,* 601 N.E.2d at 332, n. 5.

### C. Analysis—NIPSCO's Duty to Robert

■■ We proceed by analyzing NIPSCO's duty to Robert, as determined by

the relationship between NIPSCO and Robert, NIPSCO's foreseeability of the resulting harm to Robert, and the public policy concerns raised by the Act. *See Webb,* 575 N.E.2d at 995.

### 1. NIPSCO's Relationship to Robert

We have previously held that:

[C]ompanies engaged in the generation and distribution of electricity have a duty to exercise reasonable care to keep distribution and transmission lines safely insulated in places where the general public may come into contact with them.

*Northern Indiana Pub. Serv. Co. v. East Chicago Sanitary Dist.,* 590 N.E.2d 1067, 1072 (Ind.Ct.App.1992) (quoting *Brown v. Northern Indiana Public Service Co.,* 496 N.E.2d 794, 797 (Ind.Ct.App.1986)). More generally, we have held that "electric utilities have a duty to exercise such care as a person of reasonable prudence would use under like conditions and circumstances." *See Rogers v. Grunden,* 589 N.E.2d 248, 256 (Ind.Ct.App.1992) (citing *Pilkington v. Hendricks County Rural Elec. Membership Corp.,* 460 N.E.2d 1000 (Ind.Ct.App. 1984)).

Here, where the Town of Highland was a disaster area and town officials restricted access to the flood area to emergency workers only, it was the Town of Highland, not NIPSCO, which ensured that the general public did not come into contact with the at-issue power lines. Moreover, it may be generally said that the Town of Highland "was in control of the [flood] situation." *See Sharp I,* 665 N.E.2d at 616. Therefore, while NIPSCO had a relationship with, and a duty to exercise reasonable care for, the general public of Highland, it is not reasonable to extend this relationship, and its corresponding duty, to Krooswyk Trucking and its employees. As Krooswyk Trucking was under contract with Highland, and Highland, not NIPSCO, was in control of the flood emergency, we find that there was no recognizable relationship between NIPSCO and Robert.

### 2. NIPSCO's Foreseeability of Harm to Robert

Beyond the relationship between NIPSCO and Robert, we look to the evidence at trial from which the jury may have inferred either NIPSCO's actual knowledge of the specific risks posed to Robert and/or NIPSCO's general knowledge of the risks associated with flood conditions, to further assess whether NIPSCO owed a duty of care to Robert.

#### (a) NIPSCO's Actual Knowledge

The evidence most favorable to Sharp reveals that the construction site where the Gravel Dike was being built could be seen from the command center, that NIPSCO employee Shayatovich was present in the command center, and that NIPSCO employees saw dump trucks passing the command center. However, the Record is devoid of any evidence which would indicate that NIPSCO representatives were ever advised by town officials, or Krooswyk Trucking, of the Gravel Dike being constructed, and that such dike crossed under NIPSCO power lines. It requires undue speculation to impute actual knowledge to NIPSCO employees of the construction of the Gravel Dike under the subject energized NIPSCO power lines from these general facts, and thus to infer that NIPSCO had actual knowledge of the risk of electrocution posed to Krooswyk Trucking employees. Moreover, the plans for construction of the Gravel Dike, as devised by Krooswyk Trucking and approved by town officials, called for dumping stone well away from the NIPSCO overhead power lines and then moving the stone to the location of the dike with a front end loader. (R. 1140–41, 1167–68, 1964–65.) However, contrary to these plans, Robert backed his dump truck up to the dike, failed to stay at least twenty feet from the power lines, and came into contact with the power lines. Thus, while it may be inferred from the plan devised by Krooswyk Trucking that *it* had actual knowledge of the risk posed by these power lines, such facts do not amount to sub-

stantial evidence supporting the inference that NIPSCO had actual knowledge of any specific risk posed to Robert by its power lines.

### (b) NIPSCO's General Preparation and Training for Floods

Sharp presented expert testimony regarding the actions which NIPSCO employees should have taken had they been properly trained and prepared for a flood emergency. Assuming, without deciding, that the following excerpts of testimony offered by Sharp's expert, Dr. Feinberg, were admissible, we nevertheless find that such evidence does not lead to the conclusion that NIPSCO could have foreseen the harm to Robert.

Dr. Feinberg testified that NIPSCO's duties for pre-emergency planning and training and assessment of dangers at the scene of the flood should have included (1) a duty to make "safety determinations" at the scene of the flood, (2) a duty to properly train NIPSCO employees for flood emergencies, (3) a duty to be "proactive" in assessing flood dangers, (4) a duty to assess whether equipment which could reach power lines was going to be used, (5) a duty to put "up something like a saw horse ... with instructions to the operator" or "stantions [sic] on either [of the electrical lines] with flags"... "something to warn people saying don't come any closer", and (6) a duty to supply a spotter. (R. 1256, 1261, 1264–66.)

■ We find that the above planning and training procedures, even if implemented, would not have made the harm to Robert foreseeable. We make this finding because, regardless of the general policies NIPSCO had or did not have in place, NIPSCO had no actual knowledge that a

portion of the Gravel Dike was being constructed under power lines. Further, the plan approved by Highland called for the gravel to be dumped well away from the power lines. Additionally, the testimony of various town officials indicates that NIPSCO employees provided skilled assistance in furthering the purposes of the Act; namely, NIPSCO employees de-energized cut-out fuses located in the flooded sub-division of Wicker Park, aiding in the "prompt and efficient rescue" of Highland citizens. See IND.CODE § 10–4–1–2(b)(2). Thus, the evidence does not reveal that NIPSCO's general preparation and training for floods, or lack thereof, gave rise to the foreseeability of the harm to Robert.[3]

### 3. The Act and Public Policy

Lastly, we consider the public policy concerns raised by the Act. The Civil Defense and Disaster Law of 1975 exists in part for the following purposes:

(1) to provide for emergency management under a state emergency management agency;

(2) to create local emergency management departments and to authorize and direct disaster and emergency management functions in the political subdivisions of the state;

. . . .

(b) It is further declared to be the purpose of this chapter and the policy of the state:

. . . .

(2) to prepare for prompt and efficient rescue, care, and treatment of persons victimized or threatened by disaster[.]

---

**3.** We note that a trial court's decision to admit or exclude expert testimony is entrusted to the discretion of the trial court, and we will reverse only when the admission or exclusion is clearly erroneous and against the logic and effect of the facts and circumstances before the court. *Indianapolis Podiatry, P.C. v. Efroymson*, 720 N.E.2d 376, 383 (Ind.Ct.App. 1999) *trans. denied.* We further note that

generally experts are not permitted to testify as to legal conclusions. *Id.*; IND. EVIDENCE RULE 704(b). However, here, where we find that NIPSCO's conduct did not give rise to a duty, even with the admission of Dr. Feinberg's testimony, we need not revisit the merits of the trial court's decision to admit Dr. Feinberg's testimony.

IND.CODE § 10–4–1–2. Moreover, we have held that, "[g]enerally speaking, the Act is intended to facilitate rescue and remedial measures in response to a disaster." *Sharp I*, 665 N.E.2d at 614. Additionally, the Act limits the liability of those workers deemed to be "emergency management workers" as follows:

> Neither the state nor any political subdivision of the state, nor any other agencies of the state or political subdivision of the state, nor, *except in cases of willful misconduct, gross negligence, or bad faith*, any emergency management worker complying with or reasonably attempting to comply with this chapter or any order or rule adopted under this chapter, ..., shall be liable for the death of or injury to persons ... as a result of any such activity.

IND.CODE § 10–4–1–8 (emphasis added).

Here, we do not find that the legislature's intent to facilitate rescue and remedial measures during disasters is furthered by imposing a duty on NIPSCO. To the contrary, the chain-of-command established by the Act would be jeopardized by such a duty, as that duty would elevate the role of NIPSCO to being co-equal with that of the Town of Highland, an effect clearly not intended by the plain language of the Act.

### D. Conclusion

Assessing NIPSCO's relationship to Robert, the foreseeability of Robert's electrocution, and the public policy as announced by the Act and *Sharp I*, we hold that Sharp failed to prove that NIPSCO owed a duty to Robert. Accordingly, Sharp has failed to satisfy the requisite duty element of her negligence claim.

---

4. Additionally, Sharp alleges that NIPSCO "directly contravened the Town's directive that it turn-off [sic] the power to the entire flood area," citing, in piecemeal fashion, various excerpts from the Fire Chief's testimony. (Appellee's Brief at 16–19, 39.) However, our independent review of the Record reveals that no such inference may be drawn from the testimony of the various town officials who testified on this matter at trial. Specifically,

Consequently, the trial court erred in denying NIPSCO's motion for judgment on the evidence.[4]

Reversed with instructions to enter judgment in accordance with this opinion.

BAKER, J., and MATTINGLY, J., concur.

we note the following testimony of Fire Chief Haas stating that "but for Mr. Pipta, NIPSCO would have shut down all the power in the area[,]" and the testimony of Mr. Pipta stating that "it was because [he] wanted to keep the pumps on that the power was still on." (R. 909, 1616.) Accordingly, we find the Record to be devoid of facts from which one could reasonably infer that NIPSCO failed to follow the Town of Highland's directives.