Connie S. WEDEL, as Personal Representative of the Estate of Charles O. Beshear, deceased, Appellant–Plaintiff,

v.

AMERICAN ELECTRIC POWER SERVICE CORP. and Ohio Valley Coal Co., Inc., Appellees–Defendants.

No. 19A01–0410–CV–460.

Court of Appeals of Indiana.

Dec. 30, 2005.

Ninamary Buba Maginnis *, Maginnis Law Office, Louisville, KY, for Appellant.

G. Daniel Kelley, Jr., Edward P. Steegmann, Ice Miller, Indianapolis, for Appellees.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Plaintiff Connie S. Wedel, as Personal Representative of the Estate of Charles O. Beshear (collectively, "Wedel"), appeals the trial court's grant of summary judgment in favor of Appellees–Defendants American Electric Power Service Corporation and Ohio Valley Coal Company, Inc. (collectively, "AEP"). We affirm in part and reverse in part.

### Issue

Wedel raises three issues on appeal, which we consolidate and restate as whether the trial court erroneously granted summary judgment to AEP because genuine issues of material fact exist regarding the timeliness of the requests for advanced royalties made by Charles O. Beshear ("Beshear").

### Facts and Procedural History

#### I. Background: The 1970 Agreement

In a prior appeal, another panel of this Court summarized the relevant facts as follows:

> Beshear and his partner acquired options for coal on approximately 14,275 acres in Southern Indiana. By design,

---

* Counsel for Appellant withdrew her appearance on December 13, 2005.

the options were obtained on acres arranged in a checkerboard pattern in Posey, Gibson, and Vanderburgh Counties. AEP had plans to construct an electric power plant in Kentucky, directly across the Ohio River, which would entail the need for an assured supply of coal. In the spring of 1969, Beshear approached AEP and offered to sell the options. Subsequent meetings produced a general agreement that AEP would purchase the options and retain Beshear to acquire additional options on behalf of AEP. AEP and Beshear executed an agreement on January 3, 1970, [ (the "1970 Agreement") ] the pertinent portions of which read:

[2. The coal options which you [i.e., Beshear] own and control comprise some 15,000 acres .... It is [AEP's] understanding that outside interests have an undivided one-half interest in some 13,000 acres that they wish to sell, and you have first refusal on purchasing such interest. Within ninety (90) days after your receipt of the written notice referred to in item 1 above,[1] you will purchase and assign to AEP such outside [o]ne-half interest and AEP will reimburse you for the cost of such purchase but not to exceed $150,000.00. Thereafter, 7,500 acres shall be excluded in establishing any royalty payment due pursuant to the provisions of item 6 hereof. * * * * *]

5. Upon the assignment of your options under items 2 and 3 above, AEP will promptly begin an exploratory program to determine the tons of coal in said reserves, the coal quality and the expected cost of producing the coal. If such program proves that the coal in this area is minable and it also proves possible to consolidate all or substantial part or parts of the aforesaid acreage and any additional areas which might be acquired into minable tract or tracts, then AEP will either exercise or advise you of its intention to exercise the options for such acreage assigned to it by you in items 2 and 3 above.

If such program proves the coal is not minable, or it becomes impossible to consolidate the coal into minable tracts, AEP will not exercise the options assigned to it by you. AEP will re-assign to you said options, if you so desire, provided you will reimburse AEP for any amounts expended by AEP in connection with this coal reserve. For the purposes of this agreement, the options shall be deemed to have been exercised by AEP if they were not re-assigned to you or offered for reassignment to you within three years from the date when you assign the options to AEP as provided in items 2 and 3 above. Upon such

---

1. Item 1, or paragraph 1, of the 1970 Agreement provides:

It was agreed that the first step would require the drilling of five or six holes and the recovering of the cores to determine the extent and seam height of any coal encountered. The holes would be drilled in widely scattered areas on land you have under option. It was agreed that you would select the location for each hole on the basis of its geographic location and its being the least likely to upset the residents of the area. You would arrange for the drilling subject to our approval, and we would pay for the initial drilling program. *If the initial holes indicate the presence of coal in insufficient thickness to warrant further exploration, then we will deliver to you written notice of our intention to proceed with the remaining items of this letter which follow.*

Ex. A (emphasis added).

offer by AEP to re-assign said options to you, you shall have a six-month period in which to accept such offer.

6. At any time within five years after AEP has exercised its options as provided in item 5 above, you may, at your election from time to time, request AEP to pay you, an advance royalty for such coal covered by all or any number of such options which you have acquired and assigned to AEP (excluding the 7,500 acres mentioned above in item 2), at a rate of $0.015 per ton, using a reasonable recoverable factor (which is expected to be 3,750 tons per seam [2] per acre) to arrive at the total amount due. Upon such payment by AEP, you shall have no further claims with respect to such coal.

\* \* \* \* \*

8. Once we have progressed beyond item 1 above, you shall continue to acquire options on additional areas acceptable to AEP in Posey and Vanderburgh Counties, Indiana. AEP will pay the cost of obtaining such additional options and shall in addition reimburse you as provided in item 6 or 7 above, as the case may be. In the event AEP independently acquires coal without your help within the limits of the coal field, then the reserves in such areas shall be included under items 6 and 7 above for the payment of royalties to you.

On April 18, 1970, Beshear assigned to AEP the original options on 14,275 acres. In return, AEP reimbursed Beshear for the cost of acquiring the original options, and paid Beshear his first annual advance royalty payment. Beshear commenced obtaining additional options for AEP until he was notified by AEP that effective June 30, 1971, he should cease obtaining options for AEP. As of that date, Beshear had optioned an approximate total of 38,000 acres (including the original 14,275) while AEP had acquired options on another 20,000 acres through another agent. Subsequent to June 30, 1971, AEP independently acquired options on an additional 25,000 acres. Thus AEP acquired options on a total of approximately 83,000 acres. During late 1972, AEP elected to keep the coal rather than cancel under the provisions of paragraph 5 of the agreement.

*Wedel v. Am. Elec. Power Serv. Corp.*, 681 N.E.2d 1122, 1128–29 (Ind.Ct.App.1997) (citing *Am. Elec. Power Serv. Corp. v. Beshear*, 529 F.2d 1113, 1115–16 (6th Cir. 1976) ("*Wedel I*")) (internal citations omitted), *reh'g denied, trans. denied* ("*Wedel II*").

### II. AEP's Appeal to the Sixth Circuit: Wedel I

On April 21, 1973 and June 28, 1973, Beshear elected the advance royalty provisions of paragraph 6 of the agreement. He requested $0.015 per ton on the recoverable coal in seams 5 and 6 in a specified acreage, later stipulated by the parties to be 56,280 acres. When AEP refused to pay, Beshear filed a complaint in the U.S. District Court for the Western District of Kentucky. The only matter submitted to the jury was the amount that Beshear should recover under the 1973 elections. The jury returned a verdict in the amount of

---

**2.** A seam is defined as a "bed of coal or other valuable mineral of any thickness." Webster's Third New International Dictionary 2047 (2002).

$4,766,203.00 plus interest and judgment was entered for Beshear.

AEP appealed the judgment on numerous grounds, three of which are relevant here:

> (1) whether Beshear is precluded from recovering because he was not a licensed real estate broker; ... (3) whether an alleged ambiguity of paragraph 8 should have been submitted to the jury; [and] (4) whether Beshear should have been denied recovery on acreage acquired by AEP after June 30, 1971.

The rule against perpetuities was not raised by AEP as a defense in that action. As to the first issue, the Sixth Circuit panel held that

> [t]he agreement is for the sale of real estate interests of which Beshear was at least co-owner. Property owners may sell their own property without participation of real estate brokers.... That Beshear was not a licensed real estate broker cannot, therefore, preclude his recovery under the agreement.

Regarding an alleged ambiguity in paragraph 8 of the agreement, which ambiguity apparently related to the acreage to be included in the royalty calculation, the court stated,

> [a]s a matter of law, we find nothing in paragraph 8, or anywhere in the agreement, which would render the foregoing provision ambiguous or which would conflict with its interpretation as mandating that Beshear be paid a royalty on the total acreage acquired by AEP within the period specified in paragraph 6.

It was, therefore, proper that this issue was not submitted to the jury. The court also explicitly held that "[t]he agreement specifically provides, in paragraph 8, for payment to Beshear of royalties on coal options obtained without his help.... We find no error in the interpretation of the plain language of the agreement as requiring recovery on options acquired after June 30, 1971." The judgment was affirmed in all respects.

*Wedel II*, 681 N.E.2d at 1129 (citing *Wedel I*, 529 F.2d at 1116–17) (internal citations and footnote omitted).

### III. Additional Elections and the January 19th and April 18th Amendments

Thereafter, on August 15, 1977, and again on February 13, 1978, Beshear made further elections to receive advance royalties on coal deed options obtained independently by AEP. After negotiation, two agreements, dated January 19, 1978 and April 18, 1978, were executed. These agreements amended the original agreement between the parties and simplified the royalty calculations, resulting in further payments to Beshear of $645,025.75 and $1,089,092.42.

*Wedel II*, 681 N.E.2d at 1129 (citations omitted).

Pursuant to the January 19th Amendment, Beshear and AEP agreed that "payment of $84.687 per acre will be the basis for determining the amount due Beshear for his election pursuant to Item No. 6 of [the 1970 Agreement] of both No. 5 and No. 6 seam coal contained in the 7,616.5852 acres identified in Exhibit 1 ...."[3] Pl.'s Ex. B. The parties also agreed to apply the $84.687 per acre amount to any future elections, made by Beshear, "of both No. 5 and No. 6 seam coal." *Id.* Apart from these simplified calculations, the January

---

3. Exhibit 1 is not part of the record on appeal.

19th Amendment expressly provides that the 1970 Agreement "shall continue and remain in full force and effect." *Id.*

The April 18th Amendment, which was provided to us in the Supplemental Appendix, contains the following pertinent provisions:

1. AEP warrants and agrees that through February 28, 1978, AEP and its affiliates and subsidiaries have acquired a total of 84,256.793 acres in the area covered by [the 1970 Agreement] . . . .

2. The number of acres covered by Beshear's election dated February 13, 1978, upon which Beshear may elect to be paid advance royalty on both No. 5 and No. 6 seam coal pursuant to Item No. 6 of [the 1970 Agreement] is 12,060.2070 acres, computed as follows:

| | | |
|---|---|---|
| Acreage set forth in Exhibit 1 [4] | | 84,256.793 |
| Less: Previous Elections | 63,896.5852 | |
| Contract Exemption | 7,500. | 71,396.5852 |
| | | |
| Acreage covered by election dated February 13, 1978 | | 12,860.2078 |

3. Upon payment by AEP of $1,089,092.42 ($84.687 per acre × 12,860.2078 acres), Beshear acknowledges and agrees that he has received payment for his elections pursuant to Item No. 6 of [the 1970 Agreement] on all No. 5 and No. 6 seam coal contained in all the acreage set forth in said Exhibit 1 to which Beshear is entitled under the [1970 Agreement] through February 28, 1978.

Supplemental Appendix at SA–2 an SA–3. Further, paragraph 5 of each amendment makes the agreements binding "upon the parties hereto and their respective heirs,

executors, administrators, successors and assigns." *Id.*

### IV. Elections that Gave Rise to Wedel II and the Present Dispute

On June 22, 1978, Beshear made a general election to receive advance royalties, this time on all acreage not previously elected and specifically for all recoverable coal in seam 7. Again, on June 20, 1983, Beshear made an election regarding all seams of minable coal in acreage acquired by AEP to date. Finally, on September 14, 1983, Beshear made an election regarding acreage in two specific tracts, for coal in seams 5 and 6. AEP did not make payment on any of these three elections. *Wedel II*, 681 N.E.2d 1122, 1129–30.

### V. Wedel's Appeal to Recover Advance Overriding Royalties: Wedel II [5]

On August 1, 1986, Beshear filed an action to recover royalties on coal options acquired by AEP subsequent to the 1978 amendments to the 1970 Agreement and royalties on coal reserves in acreage not acquired by AEP. On January 23, 1995, AEP filed a motion for partial summary judgment regarding whether the 1970 Agreement violates the rule against perpetuities, which the trial court granted on July 5, 1995. *Id.*

On review, another panel of this Court, first, examined the common law rule against perpetuities, which provides: "An interest in property shall not be valid unless it must vest, if at all, not later than twenty-one (21) years after a life in being at the creation of the interest." *Id.* at 1132. In so doing, the court recognized

---

4. This Exhibit 1 has, likewise, not been included in the appellate record.

5. Beshear had originally brought the action against AEP, but died during its pendency. *Wedel II*, 681 N.E.2d at 1139 n. 2. Upon Beshear's death, Wedel—his daughter—was substituted as his personal representative. *Id.*

that the term "vest" is generally used to refer to either a "vesting in possession"—i.e., an immediate, existing right of present enjoyment—or a "vesting in interest"—i.e., a presently fixed right to future enjoyment. *Id.* The court concluded that, in the context of the rule against perpetuities, for an interest to vest within the meaning of the rule, the interest must be "vested in interest." *Id.*

■ Second, the *Wedel II* Court determined that the 1970 Agreement gave Beshear an overriding[6] or nonparticipating royalty[7] interest in the coal, which is a property interest. *Id.* at 1133, 1137. Third, in addressing whether Beshear's elections for advance royalty payments were valid under the rule against perpetuities, the *Wedel II* Court divided the elections into four types of acreages: (1) acreage obtained by Beshear prior to the 1970 Agreement and assigned to AEP; (2) acreage obtained by Beshear through June 30, 1971; (3) acreage independently obtained by AEP before and after June 30, 1971; and (4) acreage not acquired by AEP but within the limits of the coalfield. *Id.* The court held that the rule against perpetuities did not apply to void the overriding or non-participating royalty interests contained in the first category, which were

vested in interest at the time of the 1970 Agreement. *Id.* at 1133–34.

With respect to categories two and three, the *Wedel II* Court, initially, observed that under the 1970 Agreement, AEP was not required to acquire any additional acreage, other than that obtained by Beshear prior to, and assigned to AEP under, the 1970 Agreement. *Id.* at 1134. "The fact that AEP actually acquired additional options, by itself, is irrelevant to the common law rule against perpetuities, which is concerned not with what does happen, but with what may (or may not) happen." *Id.*

Next, the court recognized that Beshear's royalty interests consisted of two alternate interests, i.e., those elected—thus releasing all further claims in the coal in the elected acreage—and those actually mined. *Id.* The *Wedel II* Court determined that Beshear's "mined royalty interests" were vested in interest "only as to coal options owned as of the date of the agreement, and only if Beshear did not elect advance royalties." *Id.* They could not, however, vest in interest in acreage that might never be acquired by AEP and, thus, were void by the rule against perpetuities with respect to those interests. *Id.*

---

**6.** An overriding royalty interest is:

a royalty interest in minerals located on property that the royalty holder (i.e., grantee) does not actually own. An "overriding royalty" is therefore distinguished from a conventional "royalty" interest, which is retained by the owner of the fee, typically in a situation in which the mineral estate is leased to a lessee who plans to sever the minerals and pay the lessor compensation in the form of royalties.

*Wedel II*, 681 N.E.2d at 1133.

**7.** A "perpetual nonparticipating royalty interest" in oil and gas has been defined as:

a right to a percentage of oil or gas which may be produced out of given lands, unac-

companied by the power to lease or any substantial rights of ownership in the land apart from the royalty interest itself. Since the right to royalty is perpetual, and is separate from the power to lease, the right to the percentage of production frequently relates not only to whatever production may be realized under an existing lease, but also what may be realized under any future leases.

*Wedel II*, 681 N.E.2d at 1133 (citing C. Marvel, Annotation, *Perpetual Nonparticipating Royalty Interest in Oil and Gas as Violating Rule Against Perpetuities*, 46 A.L.R.2d 1268 (1956)).

By contrast, the court noted that the rule against perpetuities did not void Beshear's "advance royalty interests" in acreage obtained by him on behalf of, or acquired independently by, AEP. *Id.* This is so because the "advance royalty interests," while conditioned upon additional options being acquired by AEP, were also conditioned upon Beshear's making timely elections, i.e., not later than eight years and ninety days after execution of the 1970 Agreement. *Id.* at 1134–35. The *Wedel II* Court concluded that:

> This limitation is sufficient to avoid the application of the rule against perpetuities in that advance royalties in any acreage acquired independently by AEP, while not vested at the creation of the royalty interest, must necessarily have vested in Beshear within this time period. If not for this limitation on elections, the rule against perpetuities would void Beshear's right to advance royalties in options not then owned by Beshear or AEP at the time of the 1970 agreement.

*Id.* at 1135.

In sum, then, and with regard to categories 2 and 3, the *Wedel II* Court held that Beshear's royalty interests in "mined coal," other than in acreage owned by Beshear or AEP at the time of the 1970 Agreement, were extinguished because of Beshear's elections to receive advance royalties. *Id.* However, Beshear's advance royalty interests—as to royalties on coal options later acquired by AEP and elected by Beshear within the time period specified in the 1970 Agreement—are not void under the rule. *Id.* Indeed, it is the Agreement itself, not the rule against perpetuities, which voids Beshear's interest in acreage acquired by AEP for which a timely election was not made.[8] *Id.* Lastly, with respect to category 4, i.e., Beshear's royalty interests in acreage located within the coalfield but not acquired by AEP, the *Wedel II* Court held that both Beshear's mined and advance royalty interests are nonvested and void under the rule against perpetuities. *Id.*

## VI. Commencement of the Present Proceedings

The complaint upon which the present grant of summary judgment is based was filed on August 1, 1986, and considered by the *Wedel II* Court. On July 13, 1999, AEP filed its "Second Motion for Summary or Partial Summary Judgment," with respect to all remaining issues in Wedel's complaint. Thereafter, Wedel filed a motion for partial summary judgment. On April 21, 2004, the trial court denied Wedel's motion for partial summary judgment, recognized that it had "not been provided with data as to what acres, if any, that [Wedel] claims advance royalty as pertains to either of the elections for advance royalty," and granted summary judgment to AEP as follows:

> The [trial court] grants summary judgment for AEP in regard to any advance royalty not paid for any seams of Coal included in those areas under the election of advance royalties dated April 21, 1973 and June 28, 197[3].

> The [trial court] grants summary judgment for AEP in regard to any advance royalty not paid for any seams of Coal included in those acres under the election of advance royalties dated September 19, 1975 by reason of being

---

**8.** The *Wedel II* Court held as follows:

in Indiana, overriding or nonparticipating royalty interests are real property interests which vest immediately in the royalty holder only to the extent that such interests are granted in property owned by the grantor at the time of conveyance, otherwise such royalty interests will not vest until acquisition by the grantor.

681 N.E.2d at 1137–38.

barred by the Six year Statute of Limitation.[9]

The [trial court] grants summary judgment for AEP in regard to any advance royalty not paid for any seams of Coal included in those acres under the election of advance royalties dated August 15, 1977, February 13, 1978, June [22,] 1978, June 20, 1983, and September 14, 1983 by reason of the election for advance royalties filed by Beshear being filed more than Eight (8) years, Ninety (90) day from January 3, 1970.

Appellant's App. at 12–13. This appeal by Wedel ensued.

## Discussion and Decision

### I. Summary Judgment Standard of Review

On review of a trial court's decision to grant or deny summary judgment, we apply the same standard as the trial court: we must decide whether there is a genuine issue of material fact that precludes summary judgment and whether the moving party is entitled to judgment as a matter of law. *Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 855 (Ind.1999). Once the moving party has sustained its initial burden of proving the absence of a genuine issue of material fact and the appropriateness of judgment as a matter of law, the party opposing summary judgment must respond by designating specific facts establishing a genuine issue for trial. *Stephenson v. Ledbetter*, 596 N.E.2d 1369, 1371 (Ind.1992). We may consider only those portions of the pleadings, depositions, and any other matters specifically designated to the trial court by the parties for purposes of the motion for summary judgment. Ind. Trial Rule 56(C), (H). Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. *Cowe v. Forum Group, Inc.*, 575 N.E.2d 630, 633 (Ind.1991). Although the nonmovant has the burden of demonstrating that the grant of summary judgment was erroneous, we carefully assess the trial court's decision to ensure that the nonmovant was not improperly denied his or her day in court. *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind.1997). Specific findings and conclusions by the trial court are not required, and although they offer valuable insight into the rationale for the judgment and facilitate our review, we are not limited to reviewing the trial court's reasons for granting or denying summary judgment. *Bernstein v. Glavin*, 725 N.E.2d 455, 458 (Ind.Ct.App.2000), *trans. denied.* Rather, a grant of summary judgment may be affirmed upon any theory supported by the designated materials. *Id.*

■ In addition, "[t]he fact that the parties [made] cross-motions for summary judgment does not alter our standard of review. Instead, we must consider each motion separately to determine whether the moving party is entitled to judgment as a matter of law." *Ind. Farmers Mut. Ins. Group v. Blaskie*, 727 N.E.2d 13, 15 (Ind.Ct.App.2000).

### II. Analysis

■ On appeal, Wedel argues that the trial court erred by, first, denying her

---

**9.** Indiana Code Section 34–11–2–7 provides that:

The following actions must be commenced within six (6) years after the cause of action accrues:

(1) Actions on accounts and contracts not in writing.

(2) Actions for use, rents, and profits of real property.

(3) Actions for injuries to property other than personal property, damages for detention of personal property and for recovering possession of personal property.

(4) Actions for relief against frauds.

motion for partial summary judgment and, second, granting summary judgment in favor of AEP because all of Beshear's elections were timely made. In particular, Wedel contends that the four elections at issue—which were made on September 19, 1975, June 22, 1978, June 20, 1983, and September 14, 1983—were timely under the law of the case doctrine, in conjunction with the rule against perpetuities, and the applicable statute of limitations and, thus, should have been honored by AEP pursuant to the 1970 Agreement, as amended by the January 19th Amendment. Before we address the timeliness of Beshear's elections, we observe that, pursuant to an election made on February 13, 1978, Beshear received royalty compensation in the amount of $1,089,092.42. Under the April 18th Amendment, this compensation covered *all* of the acreages that AEP had acquired within the coalfield contemplated by the 1970 Agreement *through* February 28, 1978.[10] We also note that, by means of the September 19, 1975 election in dispute, Beshear sought compensation for "all coal in the acreages acquired by [AEP] ... through January 1, 1973." Supplemental App. at SA–8. However, because Beshear had already received royalty compensation for all acreages acquired through February 28, 1978, he was not entitled to any further compensation for the acreages acquired through January 1, 1973. Accordingly, the trial court properly granted summary judgment to AEP with respect to the September 19, 1975 election.

Turning to the timeliness of the June 22, 1978, June 20, 1983, and September 14, 1983 elections, we observe that any of those elections that are based upon the late–1972 exercise, by AEP, of its options—pursuant to paragraph 5 of the 1970 Agreement—are untimely because they occurred after the five-year period for Beshear to request an advance royalty under paragraph 6 of the Agreement. To avoid this reality, Wedel maintains that AEP "purchased an additional 3,400 acres, i.e., in the amount of 1,256 acres as of February 28, 1978, (*See* Ex. J), and another 2,143 acres as of June 15, 1981. (*See* Ex. K)." Appellee's App. at 169. As noted above, however, Beshear has already been compensated for the acreages acquired by AEP through February 28, 1978—i.e., the 3,400 acres discussed in Exhibit J. Thus to be valid, the remaining three elections must relate to acreages acquired by AEP between February 29, 1978 and June 15, 1981, i.e., the 2,143 acres discussed in Exhibit K.[11] Further, to be timely, the elections must have been made within five years of AEP's exercise—not acquisition—of its options on the 2,143 acreages.

AEP argues, however, that Beshear's latter three elections—i.e., those made on June 22, 1978, June 20, 1983, and September 14, 1983—are untimely under the rule against perpetuities, as defined by the law of this case, and the applicable statute of limitations. We separately address AEP's contentions.

### A.  Law–of–the–Case:  Rule Against Perpetuities

■■■ AEP argues that the law of this case dictates that the elections at issue were untimely because they were not

**10.**  Apparently, between late 1972 and February 28, 1978, AEP acquired an additional 1,256.79 acres of land options (i.e., 84,256.793 acres minus 83,0000 acres).

**11.**  Pursuant to Exhibit K, as of June 16, 1981, AEP had acquired a total of 86,399.68 of acreages in the coalfield at issue. Thus, from February 28, 1978 through June 16, 1981, AEP had acquired 2,142.89 of additional acreages (i.e., 86,399.68 acres minus 84,256.793 acres). The record does not reveal, however, the exact date upon which these additional acreages were acquired.

made within eight years and ninety days of the 1970 Agreement. The law of the case doctrine provides that an appellate court's determination of a legal issue binds both the trial court and the court on appeal in any subsequent appeal involving the same case and substantially the same facts. *Cha v. Warnick*, 476 N.E.2d 109, 114 (Ind. 1985), *reh'g denied, cert. denied*, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985). The purpose of the doctrine is to minimize unnecessary relitigation of legal issues once they have been resolved by an appellate court. *State v. Huffman*, 643 N.E.2d 899, 901 (Ind.1994), *reh'g denied, cert. denied*, 497 U.S. 1011, 110 S.Ct. 3257, 111 L.Ed.2d 767 (1990); *see also St. Margaret Mercy Healthcare Ctr., Inc. v. Ho*, 663 N.E.2d 1220, 1223 (Ind.Ct.App.1996). Accordingly, under the law of the case doctrine, relitigation is generally barred for all issues decided "directly or by implication in a prior decision." *Certain Northeast Annexation Area Landowners v. City of Fort Wayne*, 622 N.E.2d 548, 549 (Ind. Ct.App.1993), *reh'g denied, trans. denied.*

The *Wedel II* Court did not decide whether Beshear's elections of June 22, 1978, June 20, 1983, and September 14, 1983 were, in fact, timely. *Wedel II*, 681 N.E.2d at 1139 n. 14. However, the court did determine that: (1) Indiana's common law rule against perpetuities voids Beshear's claimed interest in advance royalties in acreage not acquired by AEP; and (2) the rule against perpetuities does not apply to void his interest in advance royalties in acreage acquired by AEP—through

Beshear or another independent agent—after the execution of the 1970 Agreement because a timely election for such royalties was required by the Agreement, i.e., not later than eight years and ninety days after execution of the 1970 Agreement. *Id.* at 1138–39. In the present appeal, the parties do not challenge the *Wedel II* Court's determination with respect to any acreage not acquired by AEP.[12] Rather, the present controversy concerns the court's determination that, for purposes of the rule against perpetuities, a timely election under the 1970 Agreement is one that occurs not later than eight years and ninety days after execution of such Agreement.

■ In that regard, AEP maintains— and apparently the trial court agreed— that it is the law of this case that the elections in dispute are untimely because they were not made on or before April 3, 1978, which is within eight years and ninety days of the 1970 Agreement. We note, however, that the law of the case doctrine is only a discretionary rule of practice and, despite its availability, courts retain the power to revisit their prior decisions or those of a coordinate court in any circumstance. *See Huffman*, 643 N.E.2d at 901. Indeed, as the *Huffman* Court acknowledged, when faced with an apparent conflict between finality and fairness—i.e., the goals fostered by the law of the case—the courts should unhesitatingly choose the latter. *Id.* Here, because we believe that, in general, the goals of finality and fairness are in conflict and, in particular, the *Wedel II* Court's determination that Besh-

---

**12.** In that regard, we agree with the *Wedel II* Court that Beshear's claim for royalties on coal in acreage not acquired by AEP is unsupported by the 1970 Agreement. 681 N.E.2d at 1139. Paragraph 8 of that Agreement provides, in pertinent part: "In the event AEP independently acquires coal without your help within the limits of the coalfield, then the reserves in such areas shall be included under

items 6 and 7 above for the payment of royalties to you." Ex. A. Pursuant to this provision, AEP only agreed to pay royalties to Beshear for coal in acreage it actually acquired in the coalfield. It did not, however, agree to pay royalties to Beshear on the entire coalfield, irrespective of whether such acreage was acquired.

ear's royalty interests must vest, if at all, within eight years and ninety days of the 1970 Agreement completely obliterates Paragraph 8 of such Agreement, we decline to follow the law of the case doctrine.

Instead, we question whether AEP even had standing to challenge the 1970 Agreement as being void under the rule against perpetuities. To have standing, for example, a plaintiff must demonstrate a personal stake in the outcome of the lawsuit *and* must show that he or she has sustained or was in immediate danger of sustaining some direct injury as a result of the conduct at issue. *Schloss v. City of Indianapolis*, 553 N.E.2d 1204, 1206 (Ind. 1990) (quoting *Higgins v. Hale*, 476 N.E.2d 95, 101 (Ind.1985)), *reh'g denied.* To be certain, AEP, as a contracting party, had a personal stake in the outcome of the *Wedel II* case, which was charged with determining whether the 1970 Agreement was void under the rule against perpetuities. However, because AEP's interest in the options derived solely from the Agreement, AEP could not show that it sustained or was in immediate danger of sustaining some direct injury.[13] Put another

way, assuming that the 1970 Agreement is void under the rule against perpetuities and, further, that the alienability of the options in question was hindered, AEP has suffered no injury. To the contrary, it received a steady assignment of options to which it apparently was not entitled.[14]

Nevertheless, we note that, even if the rule against perpetuities applies to the 1970 Agreement, Beshear's right to royalty interests would necessarily occur within his lifetime, i.e., the life in being, and twenty-one years. *See Wedel II*, 681 N.E.2d at 1134 (recognizing that, under the rule against perpetuities, "for an interest in property to be valid, it must vest not later than twenty-one years after a life in being. Any conceivable scenario in which the interest will not vest within the required period will void the interest entirely"). Indeed, because the 1970 Agreement does not contain a provision extending the rights and obligations of the parties to their heirs, successors, or assigns[15] and, thus, Beshear's interest in overriding royalties must necessarily vest or fail within his lifetime or within eight years of his

13. We are, frankly, perplexed at AEP's reliance upon the rule against perpetuities to void the 1970 Agreement because AEP's right to mine the coal found on the acreage in question—a right that, incidentally, it has never contested—derived from the Agreement, which required Beshear, in pertinent part, to acquire and assign additional options to AEP in exchange for expenses paid, as well as advanced or mined royalties. As a result, if the 1970 Agreement is void under the rule against perpetuities, AEP's interest in the land—which emanated from that agreement—is also void such that it has, in essence, converted the property in question. To the contrary, it is apparent to us that AEP raised the rule against perpetuities before the *Wedel II* Court as a red herring to effectively disenfranchise Beshear from receiving royalties, which, if elected in a timely fashion, are rightfully his.

14. Under these facts, it would appear that the original landowners of the options and their heirs or assigns, as well as other potential purchasers of the options themselves, are the only individuals that would have standing to challenge the remoteness of vesting of the options—i.e., the real property in question.

15. We observe that Paragraph 5 of the January 19th and April 18th Amendments provides that the Agreements "shall be binding upon the parties hereto and their respective heirs, executors, administrators, successors and assigns." Pl.'s Ex. B; Supplemental App. at SA-4. This "extension" language, however, pertains only to the amendments themselves and not the 1970 Agreement.

death.[16] Pursuant to the 1970 Agreement, for example, if AEP were to acquire additional options in the coalfield on the date of Beshear's death, AEP would be required to exercise those options within three years of the acquisition date, and Beshear's estate or heirs would be obligated to elect advance royalties on those options within five years of that exercise. Accordingly, under these circumstances, the rule against perpetuities does not operate to void the three elections at issue.

### B. Statute of Limitations

Next, AEP argues that the trial court's grant of summary judgment in its favor is appropriate because the June 22, 1978, June 20, 1983, and September 14, 1983 elections in dispute were made outside the applicable statute of limitations period. In particular, AEP maintains that the six-year statute of limitations period enunciated in Indiana Code Section 34–11–2–7 [17] governs the present controversy inasmuch as the overriding royalty interests contemplated by the 1970 Agreement are profits of real property. By contrast, Wedel maintains that the applicable statute of limitations period is twenty years, pursuant to Indiana Code Section 34–11–2–11,[18]

because the 1970 Agreement is a written contract.

Assuming, without deciding, that the six-year statute of limitations period of Indiana Code Section 34–11–2–7 applies to the 1970 Agreement, the trial court's grant of summary judgment is still inappropriate because the statutory period as to each election would only begin to run when AEP exercised its options. In that regard, the Agreement is similar to an installment contract. Generally, where an obligation is payable in installments, or, in this case, in AEP's exercise of its options, the statute of limitations runs as to each installment, or exercise, as it becomes due. See, e.g., Kuhn v. Kuhn, 273 Ind. 67, 71–72, 402 N.E.2d 989, 991 (Ind.1980) (citing 54 C.J.S. LIMITATIONS OF ACTIONS § 156 (1948)).

In the present case, pursuant to paragraph 6 of the 1970 Agreement, Beshear must elect, if at all, to receive his advance royalties within five years after AEP has exercised its options in the coalfield at issue. An election made outside of that five-year period is untimely pursuant to the plain language of the Agreement,

---

**16.** The 1970 Agreement contemplates a procedure whereby Beshear, first, acquires and assigns certain options to AEP within ninety days of AEP's written notice expressing its intent to proceed with the contract. Second, upon the assignments, AEP has an additional three years to decide whether to exercise the options. Third, assuming AEP exercises the options, Beshear, then, has five years in which to elect advance royalties. As a result of this procedure, the Wedel II Court determined that Beshear's interest in the advance royalties must vest or fail not later than eight years and ninety days from the date of the Agreement. This additional ninety-day provision, however, would not apply, here, because Beshear cannot assign any acreage to AEP after his death.

**17.** See supra note 8.

**18.** Indiana Code Section 34–11–2–11, provides:

An action upon contracts in writing other than those for the payment of money, and including all mortgages other than chattel mortgages, deeds of trust, judgments of courts of record, and for the recovery of the possession of real estate, must be commenced within ten (10) years after the cause of action accrues. However, an action upon contracts in writing other than those for the payment of money entered into before September 1, 1982, not including chattel mortgages, deeds of trust, judgments of courts of record, or for the recovery of the possession of real estate, must be commenced within twenty (20) years after the cause of action accrues.

without regard to any applicable statute of limitations. Accordingly, the trial court erred when it granted summary judgment in favor of AEP. That said, we note that the trial court properly denied Wedel's motion for summary judgment because the designated evidence does not demonstrate, as a matter of law, that the elections of June 22, 1978, June 20, 1983, and September 14, 1983 were timely made under the 1970 Agreement.

For the foregoing reasons, we affirm the trial court's denial of Wedel's motion for summary judgment, as well as its grant of summary judgment in favor of AEP with respect to the September 19, 1975 election. However, with regard to the latter three elections—those made on June 22, 1978, June 20, 1983, and September 14, 1983–we reverse the trial court's grant of summary judgment to AEP.

Affirmed in part and reversed in part.

DARDEN, J., concurs.

SHARPNACK, J., concurs in result.